12-621-cv
Zalaski v. City of Hartford

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

———————

August Term, 2012

(Argued: February 27, 2013        Decided: July 23, 2013)

Docket No. 12-621-cv

———————

LISA ZALASKI, ANIMAL RIGHTS FRONT, INC.,
DEREK V. OATIS,

*Plaintiffs-Appellants*,

v.

CITY OF HARTFORD, SERGEANT DANIEL ALBERT,

*Defendants-Appellees*.[*]

———————

Before:

CALABRESI, POOLER, and RAGGI, *Circuit Judges*.

———————

On appeal from a judgment of the United States District Court for the District of

Connecticut (Bryant, *J.*), after a bench trial, plaintiffs challenge the rejection of their claims

that defendant Albert violated their First, Fourth, and Fourteenth Amendment rights when

———————

[*] The Clerk of Court is directed to amend the official caption as shown above.

he arrested them at a public event during which they were protesting the treatment of circus animals. Insofar as the challenged judgment is based both on a finding that plaintiffs' arrests were supported by probable cause and on qualified immunity, we affirm on the latter ground without reaching the former. Nevertheless, we vacate the judgment to the limited extent necessary to order remand for the district court to clarify whether plaintiffs are entitled to costs as a discovery sanction.

AFFIRMED IN PART, VACATED IN PART, and REMANDED.

---

DEREK V. OATIS, Lobo & Novak, LLP, Manchester, Connecticut, *for Plaintiffs-Appellants.*

HEIDI L. HAMILTON, Crumbie Law Group, Hartford, Connecticut, *for Defendants-Appellees.*

---

REENA RAGGI, *Circuit Judge*:

In this action pursuant to 42 U.S.C. § 1983, plaintiffs, the Animal Rights Front, Inc. ("ARF") and two of its members, Lisa Zalaski and Derek V. Oatis, appeal from a judgment of the United States District Court for the District of Connecticut (Vanessa L. Bryant, *Judge*), entered after a bench trial in favor of defendant, Hartford Police Sergeant Daniel Albert, on claims that Albert violated plaintiffs' First, Fourth, and Fourteenth Amendment rights when he arrested Zalaski and Oatis at the public site of a children's foot race during which plaintiffs were protesting the treatment of animals by race sponsor Ringling Brothers and

2

Barnum & Bailey Circus ("Ringling Brothers"). See Zalaski v. City of Hartford, 838 F. Supp. 2d 13 (D. Conn. 2012).[1] Specifically, plaintiffs contend that the district court erred in finding that (1) the challenged arrests were supported by probable cause to think that Zalaski and Oatis were engaged in disorderly conduct in violation of Conn. Gen. Stat. § 53a-182(a)(5)–(6), see id. at 50–55; and (2) even if probable cause were lacking, qualified immunity shielded Albert from liability for damages, see id. at 55–57.[2] We affirm on the ground of qualified immunity without deciding the question of whether there was actual probable cause to arrest Zalaski and Oatis for disorderly conduct under Connecticut law. See Pearson v. Callahan, 555 U.S. 223, 241 (2009); Doninger v. Niehoff, 642 F.3d 334, 346–47 (2d Cir. 2011).

I.    **Background**

The pertinent facts, detailed in the district court's 80-page post-trial memorandum decision, are largely undisputed. See Zalaski v. City of Hartford, 838 F. Supp. 2d 13. In any event, after a bench trial, we would set aside those factual determinations only for clear error,

---

[1] Although plaintiffs also pursued a municipal liability claim against the City of Hartford, because they do not appeal the district court's pretrial dismissal of that claim, see Zalaski v. City of Hartford, 838 F. Supp. 2d at 23, we deem any such challenge abandoned and do not discuss it further in this opinion, see Lore v. City of Syracuse, 670 F.3d 127, 149 (2d Cir. 2012) (holding claims not addressed in appellate brief abandoned).

[2] Because plaintiffs do not appeal the district court's rejection of their First Amendment free expression or Fourteenth Amendment malicious prosecution claims on any ground apart from the challenged probable cause and qualified immunity determinations, we need not discuss these claims separately from those that plaintiffs base on the Fourth Amendment right to be free from unreasonable seizure.

3

which is not evident here.  See Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 855–56 (1982).

A.    The "Red Nose Run"

On April 23, 2006, Riverfront Plaza—a public park that the City of Hartford leased to Riverfront Recapture, a private, not-for-profit company—was the site of the first annual "Red Nose Run," an event that invited children as young as age four to participate in five non-competitive foot races ranging in length from 50 yards to a mile.  Approximately 300 persons, the majority of them young children, were expected to attend the event, a fundraiser for the Boys & Girls Club of Hartford.  The Run's co-sponsors were the Hartford Marathon Association and Ringling Brothers.  Indeed, the Run was scheduled to coincide with the arrival in Hartford of the Ringling Brothers Circus.

All Red Nose Run races began from the same point in Riverfront Plaza and progressed down a curved walkway.  As the walkway veers leftward toward the Connecticut River, it is abutted on the right by a triangular patio platform, raised by three steps.  The part of the patio approached from the walkway by the steps is approximately 66 feet in length.  As it approaches the patio, the walkway is bordered on both sides by grassy knolls dotted with trees.

Red Nose Run organizers installed a temporary tent on the patio platform.  There, children and their parents could register for, and reunite after, the races.  At that site, each

4

participating child also received a prize and complimentary refreshments were available.

### B. The Challenged Arrests

#### 1. Plaintiffs' Initial Refusal To Move from the Walkway

Joining the children and parents attending the Red Nose Run were approximately 10 to 15 animal rights activists, there to protest Ringling Brothers' treatment of animals. Four of these activists, including plaintiffs Zalaski and Oatis, were members of ARF.[3] Zalaski and Oatis carried a 6-foot by 4-foot banner proclaiming, "Got Freedom? The Animals Don't." The two other attending ARF members carried a 6-foot by 5-foot banner portraying a moribund elephant and the phrase "The Saddest Show on Earth."

At least some of the protestors, among them Zalaski and Oatis, initially located themselves on the walkway near the patio steps. A non-plaintiff ARF member testified that this was an "ideal spot" because it faced the start of the races and, thus, children would have to run directly at the protestors and their signs. Dec. 5, 2011 Tr. 46.

---

[3] Apparently, Zalaski has protested the treatment of circus animals at Ringling Brothers performances in New Haven, Hartford, or Bridgeport each year from 1997 to 2007, see Zalaski v. City of Hartford, 838 F. Supp. 2d at 29, and, on at least one prior occasion, with Oatis as her attorney, sued public officials for limiting her protest, see Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336 (2d Cir. 2010) (vacating summary judgment award to defendant on plaintiffs' First Amendment challenge to 80-foot demonstration-free zone outside Bridgeport arena, and remanding for determination as to whether plaza adjacent to arena was public forum), dismissed on remand by Friends of Animals, Inc. v. City of Bridgeport, 833 F. Supp. 2d 205, 217 (D. Conn. 2011) (holding that, even if plaza were limited public forum, 80-foot buffer zone would constitute reasonable time, place, and manner restriction), aff'd sub nom. Zalaski v. City of Bridgeport Police Dep't, 475 F. App'x 805, 2012 WL 3765016 (2d Cir. 2012) (summary order).

A number of parents complained to race organizers about protestors "yelling at" and "frighten[ing]" children at the race site. Dec. 8, 2011 Tr. 28, 32. They requested that the protestors be relocated away from the children. Organizers and a park ranger asked protestors on the walkway to move to one of the bordering grassy knolls, where other protestors had already situated themselves. ARF members, including Zalaski and Oatis, refused to move, prompting a call to the Hartford Police Department.

2.      Sergeant Albert's Dealings with Zalaski and Oatis

Defendant Sergeant Albert was one of the officers who responded to Riverfront Plaza. Much of his interaction with plaintiffs leading to the challenged arrests is recorded in a video that is part of the record on appeal. In the video, an event organizer is heard asking protestors to "work with me," Rec. 0:56, while Oatis tells Albert that the protestors intend no harm to children participating in the races, Rec. 1:20 ("The last thing we are going to do is have some kids trip on each other or have something bad happen."). After surveying the scene and learning that race organizers had a permit for the event, Sergeant Albert requested that ARF protestors on the walkway move up onto the patio steps. The ARF protestors, including Zalaski and Oatis, complied.

On the steps, the protestors no longer obstructed the walkway where races would be run, but, with their outstretched signs, they did partially block access to the registration/refreshment area. Upon hearing complaints to this effect, Sergeant Albert asked

6

the ARF protestors on the steps to join the other protestors on the grassy knoll. At trial, Albert explained that he made the request because he expected the problem of free passage on the steps to worsen as more races were run and more people sought access to the platform. See Dec. 8, 2011 Tr. 93 ("[T]he platform was filling up, the obstructing I thought had increased because there w[ere] more people that had to, you know, work their way around this banner. There were more runs to come, more waves of runs to come. There would be more people wanting to use the platform."). Albert testified that he viewed his directive as a "reasonable compromise" between the protestors and other race attendees. Id. at 80. If the protestors on the steps moved to the nearby grassy knoll, where other protestors were already located, then "[t]he platform would not be obstructed. They [i.e., the protestors] would have the right to demonstrate, and the marathon people, the [Ringling] people, would have their right to their private property and have their event and continue to, you know, give out the food and the prizes." Id. at 79–80.

Two ARF members complied with Sergeant Albert's request. Zalaski and Oatis, however, refused, whereupon Albert arrested them for criminal trespass and misdemeanor obstruction of free passage. Plaintiffs were formally charged with the latter offense, see Conn. Gen. Stat. § 53a-182a, but that charge was dismissed a week later and no further prosecution was pursued.

7

C. The Instant Action

On April 21, 2008, ARF, Zalaski, and Oatis—together represented by attorney Oatis—filed this § 1983 action against Sergeant Albert and the City of Hartford for false arrest, malicious prosecution, and interference with free expression. On January 18, 2012, following a two-day bench trial, the district court rejected plaintiffs' claims and directed the entry of judgment in favor of Albert. See Zalaski v. City of Hartford, 838 F. Supp. 2d at 58.

Specifically, the district court ruled that Albert did not violate plaintiffs' First Amendment rights by directing them to move from the patio steps to the grassy knoll because, although plaintiffs' protest raised a matter of public concern and Riverfront Plaza qualified as a public forum, Albert's direction was content-neutral and a reasonable time, place, and manner restriction. See id. at 29–46. In any event, the district court concluded that, even if Albert's conduct did violate the First Amendment, he would be shielded by qualified immunity because a reasonable police officer would not have understood the "complex and nuanced contours" of First Amendment jurisprudence as applied to the circumstances presented. Id. at 47.

The district court further rejected plaintiffs' false arrest and malicious prosecution claims, finding that, irrespective of the particular offenses informing Sergeant Albert's decision to arrest or the formal filed charge, probable cause supported arresting Zalaski and Oatis for disorderly conduct. See id. at 50–55 (citing Conn. Gen. Stat. § 53a-182(a)(5)–(6) and reasoning that plaintiffs' hindering parents' and children's access to the registration area

8

provided probable cause to think they were obstructing pedestrian traffic). The district court

concluded that Albert was, in any event, shielded by qualified immunity on these claims as

well because, if actual probable cause did not support Zalaski's and Oatis's arrests, there was

at least "arguable probable cause" to support a reasonable officer's decision to take them into

custody. See id. at 56–57. The district court concluded that qualified immunity was further

warranted because, insofar as Albert had sought to achieve a balance among the protestors'

right to expression, the organizers' permit rights, and the government's interest in public

safety, a reasonable officer in his position could have thought that his relocation directive

was lawful. See id. at 57.

This timely appeal followed.

## II. **Discussion**

### A. Probable Cause Challenge

#### 1. Qualified Immunity Review

In evaluating a challenge to a judgment entered after a bench trial, we review the

district court's findings of fact for clear error and its legal conclusions de novo. See

Bessemer Trust Co., N.A. v. Branin, 675 F.3d 130, 135 (2d Cir. 2012). Among the

conclusions of law that we review de novo is a decision affording a defendant qualified

immunity. See Walczyk v. Rio, 496 F.3d 139, 153 (2d Cir. 2007).

Qualified immunity shields law enforcement officers from § 1983 claims for money

damages provided that their conduct does not violate clearly established constitutional rights

9

of which a reasonable person would have been aware. See, e.g., Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Two questions inform qualified immunity analysis. First, do the facts show that the officer's conduct violated plaintiff's constitutional rights? If the answer to this question is no, further inquiry is unnecessary because where there is no viable constitutional claim, defendants have no need of an immunity shield. But if the answer is yes, or at least not definitively no, a second question arises: was the right clearly established at the time of defendant's actions? See Ashcroft v. al-Kidd, 131 S. Ct. at 2080; Walczyk v. Rio, 496 F.3d at 154.

Courts are no longer required to answer these questions in sequence. See Pearson v. Callahan, 555 U.S. at 227, overruling in part Saucier v. Katz, 533 U.S. 194 (2001). Addressing the latter question first is particularly appropriate where the former turns on difficult or novel questions of constitutional or statutory interpretation, but it is nevertheless clear that the challenged conduct "was not objectively unreasonable in light of existing law." Coollick v. Hughes, 699 F.3d 211, 219–20 (2d Cir. 2012); see also Ashcroft v. al-Kidd, 131 S. Ct. at 2080.

In making the latter determination, the inquiry is not how courts or lawyers might have understood the state of the law at the time of the challenged conduct. Rather, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. at 202 (emphasis added); accord Winfield v. Trottier,

10

710 F.3d 49, 56–57 (2d Cir. 2013). If the illegality of the conduct would not be so apparent, the officer is entitled to qualified immunity. See Walczyk v. Rio, 496 F.3d at 154. Thus, even if a right is clearly established in certain respects, qualified immunity will still shield an officer from liability if "officers of reasonable competence could disagree" on the legality of the action at issue in its particular factual context. Malley v. Briggs, 475 U.S. 335, 341 (1986). In short, if at least some reasonable officers in the defendant's position "could have believed that [the challenged conduct] was within the bounds of appropriate police responses," the defendant officer is entitled to qualified immunity. Saucier v. Katz, 533 U.S. at 208; accord Walczyk v. Rio, 496 F.3d at 154.

As these precedents make clear, qualified immunity provides a broad shield. It does so to ensure "that those who serve the government do so with the decisiveness and the judgment required by the public good." Filarsky v. Delia, 132 S. Ct. 1657, 1665 (2012) (internal quotation marks omitted). Toward that end, it affords officials "breathing room to make reasonable but mistaken judgments" without fear of potentially disabling liability. Messerschmidt v. Millender, 132 S. Ct. 1235, 1244 (2012) (internal quotation marks omitted). In sum, qualified immunity employs a deliberately "forgiving" standard of review, Amore v. Novarro, 624 F.3d 522, 530 (2d Cir. 2010) (internal quotation marks omitted), that "provides ample protection to all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. at 341; accord Ashcroft v. al-Kidd, 131 S. Ct. at 2085.

11

## 2.    Probable Cause Standard

Plaintiffs submit that the district court erred in finding that Albert's arrests of Zalaski and Oatis were supported by probable cause—or even arguable probable cause—to think that these two ARF members were engaged in any violation of Connecticut law.  In evaluating this argument, we are mindful not only that qualified immunity is a forgiving standard but also that probable cause is a "fluid" one that does not demand "hard certainties," Illinois v. Gates, 462 U.S. 213, 231–32 (1983), or "mechanistic inquiries," Florida v. Harris, 133 S. Ct. 1050, 1055 (2013) (describing probable cause as "practical," "common-sensical," "all-things-considered" standard for assessing probabilities in particular factual context).

Under both federal and Connecticut law, "probable cause to arrest exists when police officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Walczyk v. Rio, 496 F.3d at 156 (internal quotation marks omitted); see State v. James, 261 Conn. 395, 415 (2002).  Thus, probable cause does not demand that an officer's good-faith belief that a suspect has committed or is committing a crime be "correct or more likely true than false." Texas v. Brown, 460 U.S. 730, 742 (1983).  It requires only facts sufficient to establish the sort "of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.'" Florida v. Harris, 133 S. Ct. at 1055 (alteration in original) (quoting Illinois v. Gates, 462 U.S. at 231, 238).

12

Even where a reviewing court, applying these principles, concludes that probable cause to arrest was lacking in a given case, an officer "will still be entitled to qualified immunity . . . if he can establish that there was 'arguable probable cause' to arrest." Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." Id. (internal quotation marks omitted); accord Walczyk v. Rio, 496 F.3d at 163. Here, we need not, and do not, decide whether there was actual probable cause to arrest Zalaski and Oatis for disorderly conduct under Connecticut law because we conclude, in any event, that there was arguable probable cause to support the arrests.

### 3. Connecticut's Disorderly Conduct Statute

Because even an assessment of arguable probable cause requires some consideration of Connecticut's prohibition of disorderly conduct, we begin with the relevant statutory text:

> A person is guilty of disorderly conduct when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: . . . (5) obstructs vehicular or pedestrian traffic; or (6) congregates with other persons in a public place and refuses to comply with a reasonable official request or order to disperse.

Conn. Gen. Stat. § 53a-182(a).[4]

---

[4] Plaintiffs do not—and cannot—argue that Albert's reliance on other Connecticut crimes in arresting or charging Zalaski and Oatis precluded the district court or this court from analyzing probable cause by reference to the state's disorderly conduct statute. See Devenpeck v. Alford, 543 U.S. 146, 153 (2004) (stating that arresting officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts

Connecticut's Supreme Court has construed this misdemeanor's "intent" element to mean "predominant intent." State v. Indrisano, 228 Conn. 795, 809 (1994). Thus, "to support a conviction for disorderly conduct [under § 53a-182(a)], the defendant's predominant intent must be to cause inconvenience, annoyance or alarm, rather than to exercise his constitutional rights." Id. at 809.[5] The predominant intent requirement appears to derive from Colten v. Commonwealth, 467 S.W.2d 374 (Ky. 1971), in which the Kentucky Court of Appeals, construing a similarly worded statute, stated that "[p]redominance can be determined either (1) from the fact that no bona fide intent to exercise a constitutional right appears to have existed or (2) from the fact that the interest to be advanced by the particular exercise of a constitutional right is insignificant in comparison with the inconvenience, annoyance or alarm caused by the exercise," id. at 377, quoted in State v. Indrisano, 228 Conn. at 807.

Albert argues that a reasonable officer should not be expected to know of Indrisano's

provide probable cause"); Jaegly v. Couch, 439 F.3d 149, 154 (2d Cir. 2006) (articulating relevant inquiry as "whether probable cause existed to arrest" and stating that "it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest"). Nor would such a conclusion follow from Albert's deposition testimony that he did not think there was probable cause to arrest Zalaski and Oatis for disorderly conduct. See United States v. Gagnon, 373 F.3d 230, 239 (2d Cir. 2004) (stating that "law enforcement officer's mistaken belief that probable cause did not exist" at time of arrest "is irrelevant to a court's later determination of whether probable cause existed").

[5] Connecticut's statutory prohibition on the closely related crime of "obstructing free passage" requires no such judicial gloss, as it specifically exempts from criminal liability "a person [who] is engaging in any activity which is expressive of rights guaranteed under the Constitution of the United States." Conn. Gen. Stat. § 53a-182a.

gloss on the intent requirement of § 53a-182(a) in making a probable cause determination. In support, he cites Amore v. Novarro, 624 F.3d 522, a case in which this court recognized the general rule that we "impute knowledge of the case law to public officials," id. at 535, but found a limited exception in the "unusual case" in order to advance the broader goals of qualified immunity, id. at 534–35. We deemed Amore an unusual case because the arresting officer there actually reviewed penal law text at the time he placed defendant under arrest, unaware that the section he consulted had been declared unconstitutional some 15 years earlier. See id. at 526–27. Here Sergeant Albert did not review the text of § 53a-182(a) before placing Zalaski and Oatis under arrest; indeed, he did not even arrest them for disorderly conduct. These circumstances locate this case a considerable distance from Amore. In any event, we do not here decide what constitutes an "unusual case" falling within Amore's exception because we conclude that a reasonable officer in the circumstances presented by this case, even when charged with knowledge of Indrisano, would have had arguable probable cause to believe Zalaski and Oatis were violating Conn. Gen. Stat. § 53a-182(a). Thus, our ensuing analysis does not—and need not—afford Albert the benefit of any Amore exception.

4.     Arguable Probable Cause To Think Plaintiffs Engaged in Disorderly Conduct

Plaintiffs submit that no reasonable officer could have thought probable cause existed to arrest them for disorderly conduct in violation of § 53a-182(a)(5) because (a) their conduct

15

did not completely impede pedestrian traffic, as they argue is required to "obstruct" that traffic; and (b) there was no basis to conclude that their "predominant intent" was "to cause inconvenience, annoyance or alarm, rather than to exercise [their] constitutional rights" to free speech. State v. Indrisano, 228 Conn. at 809.[6] Neither argument is convincing.[7]

### a. Obstruction

Because the word "obstructs," as used in Conn. Gen. Stat. § 53a-182(a)(5) (providing that anyone who "obstructs vehicular or pedestrian traffic" with requisite intent is guilty of disorderly conduct), is not defined by statute, it is properly given its common meaning. See Conn. Gen. Stat. § 1-2z. The common meaning of "obstruct," as the district court observed by reference to the dictionary, is "'(1) to block or close up by an obstacle; (2) to hinder

---

[6] As plaintiffs correctly observe, the district court did not address Indrisano's construction of the mens rea requirement for disorderly conduct. The district court's awareness of the requirement might nevertheless be inferred from its quotation of Indrisano in denying defendants' summary judgment motion, see Zalaski v. City of Hartford, 704 F. Supp. 2d 159, 171 (D. Conn. 2010), and its discussion of State v. Muckle, 108 Conn. App. 146 (Ct. App. 2008), a case that reviewed disorderly conduct convictions in light of Indrisano. We need not conclusively decide whether the district court correctly applied Indrisano because our own qualified immunity review is de novo. See Walzcyk v. Rio, 496 F.3d at 153; see also Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 398 (2d Cir. 2005) (noting that we may affirm judgment after bench trial on any ground with record support, even if "basis for the district court's holding is not apparent").

[7] Because we identify arguable probable cause to support Zalaski's and Oatis's arrests under § 53a-182(a)(5) (obstructing pedestrian traffic), we need not consider the same question as it applies to § 53a-182(a)(6) (refusing to obey a reasonable order to disperse). See State v. Anonymous, 33 Conn. Supp. 93, 99 (C.P. 1976) (suggesting that imminent or reasonably likely breach of peace is required to order dispersal under subsection (a)(6)).

passage, action or operation; (3) to cut off from sight.'" Zalaski v. City of Hartford, 838 F. Supp. 2d at 52 (quoting Merriam-Webster Online Dictionary, http://www.merriamwebster.com/dictionary/obstruct (visited Jan. 17, 2012)). The district court concluded that obstruction was evident in this case from the fact that the plaintiffs, by holding a large sign on the steps leading to the platform, "hindered the passage of participants into the registration tent." Id.

Plaintiffs do not dispute this finding of hindrance. Rather, they contend that a hindrance is not enough to constitute the proscribed obstruction. Relying on the first dictionary definition of "obstruct," plaintiffs submit that § 53a-182(a)(5) prohibits only actions that fully block or impede pedestrian traffic, which their actions on the steps at issue did not.

Plaintiffs point us to no Connecticut precedent clearly limiting the term "obstruct" in § 53a-182(a)(5) to a complete blockage of pedestrian traffic. To be sure, in State v. Muckle, 108 Conn. App. 146 (Ct. App. 2008), which upheld the convictions of abortion protestors under § 53a-182(a)(5), evidence indicated that signs and baby carriages that the protestors positioned on a sidewalk leading to an abortion clinic effectively blocked that walkway, forcing pedestrians to step off the sidewalk to negotiate around the obstructions and to get to the clinic, see id. at 153–54. But in noting these circumstances, the Muckle court did not state that only the complete blockage of a sidewalk could demonstrate obstruction amounting to disorderly conduct. Nor would such a conclusion be obvious to a reasonable police officer

17

given that, in other criminal contexts, Connecticut appears to have construed the word "obstruct" to prohibit hindrance short of total impediment. See, e.g., State v. Biller, 5 Conn. App. 616, 621 (Ct. App. 1985) (consulting dictionary definition of "obstruct," which included "hinder," in holding that defendant who "merely delayed" post-arrest search of his person could be found guilty of interfering with police officer under Conn. Gen Stat. § 53a-167a); State v. Beck, 5 Conn. Cir. Ct. 587, 589 (App. Div. 1969) (adopting definition of "obstruct" as "to interpose obstacles or impediments, to hinder, impede, or in any manner intrude or prevent" in holding that individual who boarded police wagon and demanded to be taken to station with arrestees could be convicted of obstructing justice in violation of then-extant Conn. Gen Stat. § 53a-165 (internal quotation marks omitted)); State v. Neubauer, 2 Conn. Cir. Ct. 169, 174 (App. Div. 1963) (requiring only that conduct, to obstruct officer, "in some manner, hinder the officer or make his job difficult").

On qualified immunity review, we need not here conclusively decide the scope of obstruction proscribed by Connecticut's disorderly conduct statute. We need only conclude, as we now do, that Connecticut has not so clearly limited obstruction to the condition of fully blocking pedestrian traffic as to foreclose a reasonable officer from making an arguably correct finding of probable obstruction based on plaintiffs' actions in blocking part of the steps at the Red Nose Run. This is not to suggest that an officer would have arguable probable cause to arrest an individual for disorderly conduct under the Connecticut statute based simply upon the person's presence in a location being utilized by others. We conclude

18

only that the facts known to the police in this case–namely, that individuals were holding a large banner, positioned partially in front of a clearly visible point of ingress and egress to be used predominantly by young children–permitted reasonable officers to think that probable cause existed to support arrests for disorderly conduct.

              b.       Predominant Intent

Plaintiffs contend that, even if a reasonable officer could have had probable cause to think that plaintiffs were obstructing pedestrian traffic at the Red Nose Run, the officer could not reasonably have thought that their predominant intent was to cause inconvenience, annoyance, or harm rather than to exercise their constitutional rights. We disagree.

An assessment of intent frequently depends on circumstantial evidence. See, e.g., United States v. MacPherson, 424 F.3d 183, 189–90 (2d Cir. 2005) (collecting cases recognizing that mens rea elements of knowledge and intent are often proved through circumstantial evidence). But unlike at trial, where circumstantial evidence must support a finding of culpable intent beyond a reasonable doubt, a probable cause determination, and thus an arguable probable cause determination, can be made on "substantially less" evidence. State v. Clark, 255 Conn. at 292–93; see Illinois v. Gates, 462 U.S. at 235 ("'[T]he term "probable cause," according to its usual acceptation, means less than evidence which would justify condemnation.'" (quoting Locke v. United States, 7 Cranch. 339, 348 (1813) (Marshall, C.J.))). Moreover, because "the practical restraints on police in the field are

19

greater with respect to ascertaining intent . . . , the latitude accorded to officers considering the probable cause issue in the context of mens rea crimes must be correspondingly great." Cox v. Hainey, 391 F.3d 25, 34 (1st Cir. 2004); see Paff v. Kaltenbach, 204 F.3d 425, 437 (3d Cir. 2000) (recognizing that arresting officers must make judgment calls in determining suspect's state of mind); see also Conner v. Heiman, 672 F.3d 1126, 1132 (9th Cir. 2012) (observing that whether inference of innocent intent "was also reasonable, or even more reasonable, does not matter so long as the [culpable intent] conclusion was itself reasonable").

With these principles in mind, we consider the totality of the circumstances at the time of the challenged arrests. At the outset, we recognize—as Sergeant Albert himself appears to have recognized—that plaintiffs' protests about Ringling Brothers' treatment of animals qualify as protected speech. The record demonstrates that Sergeant Albert never attempted to silence or delay that speech. Rather, he sought to relocate it by a modest distance of approximately 20 feet, from a set of steps where protesters were hindering pedestrian traffic to a nearby grassy knoll where other like-minded protestors were already situated and exercising their First Amendment rights.

In requesting relocation, Albert knew that organizers of the Red Nose Run had a permit for their activities. He knew that numerous young children would be participating in the Run and that those children, some by themselves, others with attending adults, would

20

have to use the steps in moving between the walkway where races were to occur and the platform where a tent was set up for registration, prizes, and refreshments. Albert knew that some people had already complained that the protestors holding large banners were hindering pedestrian traffic on or near the steps. He anticipated that these concerns would only increase as more races were run. See Dec. 8, 2011 Tr. 93 ("There were more runs to come, more waves of runs to come. There would be more people wanting to use the platform.").[8] He also knew that there had been earlier complaints of children being frightened by protestors shouting at them. While Oatis assured Albert that the protestors did not wish any harm to befall the children, Albert was entitled—indeed obliged—to assess for himself the risks presented from the totality of the circumstances in attempting to accommodate the interests of all concerned. See Paff v. Kaltenbach, 204 F.3d at 437 (identifying nothing in probable cause jurisprudence requiring officer to accept suspect's assertion of innocence at face value); cf. Marcavage v. City of New York, 689 F.3d 98, 107 (2d Cir. 2012) (recognizing that if two defendants could claim exemption from demonstration-free zone, others would be entitled to demand same, creating larger threat to security and order). In that regard, nothing in the record indicates that plaintiffs' protests would not have been fully

_____

[8] Evidence that the registration area did not, in fact, become appreciably more crowded following later races does not compel the conclusion that Albert's concerns were unreasonable at the time they prompted him to request relocation. Much less does such evidence render unreasonable an inference of predominant intent from plaintiffs' refusal to relocate. See Florida v. Harris, 133 S. Ct. at 1059 ("[W]e do not evaluate probable cause in hindsight . . . .").

21

visible and audible to their intended audience from the proposed relocation area. As already noted, most persons protesting Ringling Brothers' treatment of animals at the Red Nose Run had agreed to do so from the grassy knoll.

From these circumstances, a reasonable officer could have concluded that the only thing plaintiffs would lose by moving from the steps to the grassy knoll was the ability to hinder the movement of children and other race attendees as they traveled from the walkway to the patio platform. And therefrom, at least some reasonable officers could have inferred from plaintiffs' refusal to relocate to a site where their right to protest would be undiminished, but their ability to obstruct would be lost, that their predominant intent in insisting on staying on the steps was to obstruct pedestrian traffic. See State v. Indrisano, 228 Conn. at 807 (allowing finding of predominant intent where circumstances demonstrate that expressive intent is "insignificant in comparison with the inconvenience, annoyance or alarm caused by the exercise" (internal quotation marks omitted)).

Because there was arguable probable cause for a reasonable officer to think that plaintiffs were engaged in the sort of disorderly conduct proscribed by Conn. Gen. Stat. § 52a-182(a)(5), the district court properly awarded judgment to Sergeant Albert on the ground of qualified immunity.

B.    Discovery Sanctions

Rule 26(g)(1) of the Rules of Civil Procedure provides that all discovery responses "must be signed by" an attorney of record, or by the party personally, if unrepresented, which

22

signature certifies the accuracy of any disclosed information "to the best of the person's knowledge, information, and belief." Rule 26(g)(3) provides the enforcement mechanism for this requirement:

> Sanction for Improper Certification. If a certification violates this rule without substantial justification, the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both. The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation.

Fed. R. Civ. P. 26(g)(3); see Chambers v. NASCO, Inc., 501 U.S. 32, 51 (1991) (stating that 26(g)(3) mandate "extends only to whether a court must impose sanctions, not to which sanction it must impose" (emphasis in original)); Chase Manhattan Bank, N.A. v. Turner & Newall, PLC, 964 F.2d 159, 165 (2d Cir. 1992) (observing that Rule 26(g) "empowers a district court to impose a variety of sanctions for improper" conduct).

The district court sanctioned defendants for violating Rule 26(g) in this case by striking Sergeant Albert's interrogatory responses, but it denied plaintiffs' request for costs and fees, stating as follows: "Defendants note that the Plaintiffs' counsel [i.e., Oatis] is pro se and cite authority indicating that his status as pro se counsel is a bar to such recovery. As the Plaintiffs have not addressed this argument, the Plaintiffs' fee request is denied." Order, No. 08-cv-601 (D. Conn.), ECF No. 60.

Plaintiffs now argue that the district court's ruling rests on an error of law because the general rule that a pro se attorney cannot recover attorney's fees does not apply to a pro se attorney who represents one or more plaintiffs in addition to himself. See Schneider v.

23

<u>Colegio de Abogados de Puerto Rico</u>, 187 F.3d 30, 32 (1st Cir. 1999) (awarding fees under 42 U.S.C. § 1988 to prevailing attorney-plaintiff who represented another plaintiff in addition to himself).

This court has not addressed whether a <u>pro se</u> attorney who represents plaintiffs in addition to himself may be awarded fees. We will not do so in the context of this discovery dispute because plaintiffs failed to raise the argument in the district court, thereby forfeiting it on appeal. <u>See</u> <u>Katel Ltd. Liab. Co. v. AT&T Corp.</u>, 607 F.3d 60, 68 (2d Cir. 2010). Accordingly, we affirm the denial of attorney's fees as a discovery sanction.

We note, however, that the district court did not specifically deny plaintiffs' request for costs by reference to counsel's <u>pro se</u> status. Rather, its order is silent on that point. Defendants did not argue in the district court and Albert does not contend on appeal that a <u>pro se</u> plaintiff cannot be awarded costs pursuant to Rule 26(g)(3). <u>See</u> <u>Carter v. Veterans Admin.</u>, 780 F.2d 1479, 1481 (9th Cir. 1986) ("An award of costs to a <u>pro se</u> litigant . . . presents a different question [from that of attorney's fees] because it would represent funds actually expended."). Accordingly, we vacate the judgment only in order to remand this case for the limited purpose of having the district court clarify whether it awards plaintiffs the costs incurred as a result of defendants' discovery certification violation.

## III.    Conclusion

To summarize, we conclude as follows:

1. Because the trial record admits arguable probable cause to think that plaintiffs

engaged in disorderly conduct with the predominant intent required by Conn. Gen. Stat. § 53a-182(a)(5), the district court properly entered judgment in favor of defendant Albert on the basis of qualified immunity.

2. Plaintiffs' argument that they are entitled to attorney's fees as a discovery sanction on the ground that one plaintiff, despite appearing pro se, acted as counsel to the remaining plaintiffs is forfeited on appeal by their failure to raise it below. Nevertheless, because defendant does not dispute plaintiffs' ability to recover costs, and because the district court failed specifically to rule on that application, we remand for clarification as to whether the district court awards costs pursuant to Fed. R. Civ. P. 26(g)(3).

The judgment of the district court is AFFIRMED in part and VACATED in part, and the case is REMANDED for further proceedings consistent with this opinion.