JON 0. NEWMAN, Circuit Judge.
A pre-dawn sidewalk conversation between police officers and a member of the public that began with a request for help finding a bathroom escalated into a confrontation, an arrest, a struggle, a use of force and pepper spray, a lawsuit, and now this appeal from dismissal of the lawsuit. Imani Brown appeals from the June 18, 2014, judgment of the District Court for the Southern District of New York (Katherine B. Forrest, District Judge), granting a motion for summary judgment by New York City police officers Justin Naimoli and Theodore Plevritis and the City of New York.
We conclude that Brown’s claim against the officers for unlawful arrest is defeated by their defense of qualified immunity, her First Amendment claim was properly dismissed as lacking any merit, and her claim against them for use of excessive force must be remanded for trial. We have no occasion to consider Brown’s claims against the City because her brief on appeal does not challenge the dismissal of those claims. We therefore affirm in part, reverse in part, and remand.
Background
Several facts are undisputed, and, on this appeal from the grant of the Defendants’ motion for summary judgment, those that are disputed must be viewed in the light most favorable to the Plaintiff, Imani Brown. See Costello v. City of Burlington, 632 F.3d 41, 45 (2d Cir.2011).
On the night of November 15, 2011, an Occupy Wall Street crowd gathered in Zuccotti Park in lower Manhattan. Brown *96 received a text message saying that the park had been raided. She went to observe around 2 a.m. and left around 5 a.m. to find a bathroom. Two blocks away, she came to a Starbucks store and spoke to an employee who told her that the store was closed but would open at 5:30, which was 15 or 20 minutes later. She remained on the sidewalk, intending to wait until the store opened.
That night Officers Naimoli and Plevritis were working the 11:15 p.m. to 7:50 a.m. shift. They drove by Zuccotti Park as the crowd was being cleared. They arrested a man who was blocking traffic and after taking him to Central Booking resumed their patrol around 4 a.m.
At 5:05 a.m., an assistant manager of the Starbucks store called 911 and reported six people knocking on the door of his closed store, trying to get in to use the bathroom. He said that they were “knocking on the door really really bad trying to get in,” and “making nasty comments.” Defendants’ Statement of Undisputed Facts, ¶ 21.[2] The 911 operator heard the assistant manager tell an employee to lock the bathroom door from the outside because he heard “banging on the doors ... [t]he outside doors.”. Exhibit 16 (911 call transcript). A radio dispatcher immediately relayed the substance of the 911 call to Officers Naimoli and Plevritis, stating in part, “[S]ix people banging on the doors refusing to leave at Starbucks coffee.” Hearing the transmission, Naimoli and Plevritis drove to the store location, arriving there within minutes of the 911 call.
From this point on, most of the facts, as recounted in depositions and testimony at a civilian complaint hearing, are in dispute. We continue with Brown’s version. When the officers arrived, only she and two other persons were waiting near the Starbucks store. Brown approached the police car, gestured to have the window rolled down, and spoke to the officers through the passenger side front window. Brown asked if the officers knew where she could find a bathroom.
One officer answered her question with a question of his own, “What do we look like, the potty police?” Brown asked her question again. One officer answered that Brown should “piss in the park.”[3] Brown asked whether that would be illegal and was told that it would be. Brown then said, “[S]o you are just not going to help me, you don’t have anything you can offer me, any advice you can offer?” One officer, still in the police car, then told Brown that she “should go home.” She responded that she lived over an hour away and preferred to wait until the Starbucks opened.
As Brown walked away from the police car, the officers got out of the police car and asked for her ID. She repeatedly asked why they wanted it, they gave no explanation, and she refused to provide any ID. As Officer Plevritis acknowledged in his deposition, he then grabbed Brown and said to her, “[GJive me your identification or you’re going to be placed under arrest.” When she again refused, he told her, “You’re under arrest.” Brown repeatedly asked why she was being arrest *97 ed but received no explanation. One or both of the officers then grabbed her arm, held it behind her back, and attempted to apply handcuffs. An officer kicked her legs out from under her, and she fell to her knees. A videotape shows that handcuffs had been placed on one of Brown’s wrists before she was thrown to the ground. On the ground, Brown reached with her other arm for her phone, wallet, and scattered contents of her purse.
The videotape shows both officers on the ground, endeavoring to bring her free arm behind her in order to complete the handcuffing. The videotape shows a struggle with considerable shouting by Brown, the officers, and a bystander.
Officer Plevritis administered a burst of pepper spray directly to Brown’s face. When Brown realized her skirt had come up and “that [her] bottom was exposed,”, she ask if the officers could pull her skirt down. They prudently declined, one of them answering, “No, it wouldn’t have been like that, if you weren’t causing trouble.” When asked what she then did, Brown said she was “reaching with my free arm trying to pull my skirt down.” As the struggle to handcuff Brown continued, Officer Plevritis administered a second burst of pepper stray directly in her face from a distance of one foot.
The officers then completed the handcuffing, raised Brown to her feet, placed her in the police car, and drove her to a police station.
The officers’ arrest report stated that Brown “was asked to leave ... after causing a disturbance in front of a store” and “refuse[d] to give ID and responded with profanity.” Document 54-11 (emphasis added). Her arrest was stated to be for “refusing to move on” in violation of the disorderly conduct provision, subsection 6, of N.Y. Penal Law § 240.20. Later, Officer Naimoli spoke with an assistant district attorney who prepared a criminal complaint. That complaint charged Brown with violating subsections (1) and (3) of Penal Law § 240.20 by “engaging] in fighting and in violent, tumultuous and threatening behavior” and “us[ing] abusive and obscene language ... in a public place” “with intent to cause public inconvenience, annoyance and alarm, and recklessly causing a risk thereof.” The complaint, which Officer Naimoli signed under oath, alleged that he personally observed Brown “banging on the door of Starbucks and screaming” and that her conduct “caused a crowd to gather and people to express alarm.” Officer Naimoli later admitted in his deposition that he did not personally observe Brown banging on the door of Starbucks and that he did not see her yelling at a Starbucks employee.
After the criminal complaint was dismissed, Brown, filed suit under 42 U.S.C. § 1983, alleging claims for false arrest and use of excessive force in violation of the Fourth Amendment, and retaliation in violation of the First Amendment. The District Court ultimately granted the Defendants’ motion for summary judgment, concluding that “[qualified immunity insulates defendants from liability on [Brown’s] First and Fourth Amendment claims,” Brown v. City of New York, No. 13-cv-1018, 2014 WL 2767232, at *10 (June 18, 2014), because “even if probable cause did not actually exist,” “the officers directed plaintiff to leave the area and go home, but plaintiff decided not to leave the area, and told the officers that she could not go home,” Brown, 2014 WL 2767232, at *9 (emphasis added), and “[t]hus it was objectively reasonable for the officers] to believe that probable cause existed to arrest [Brown],” id. The Court also granted summary judgment for the Defendants on the excessive force claim, concluding that their use of force *98 was “reasonable under the circumstances.” Id. at *8.
Discussion
Before considering the legal issues on appeal, we pause to observe that, even on the officers’ version of the events, the arrest, the ensuing scuffle, and this lawsuit could very likely have been avoided if the police had explained to Brown why they were asking for her ID. Commendably, the officers initially intended to issue a summons, rather than make an arrest, for an offense, disorderly conduct, that was only a “violation” under New York law,[4] an offense category less serious than even a “misdemeanor.”[5] To use the summons procedure, they needed to know Brown’s name and address. Their request for her to produce some ID was entirely appropriate. So was her repeated inquiry, “[0]n what grounds?”
At that point, the officers could have explained that they needed her name and address from her ID in order to issue a summons.[6] Instead, as Officer Plevritis admitted in his deposition, he grabbed Brown before he told her she was going to get a summons. Then, still giving her no reason why they wanted her ID, they told her only, as Officer Plevritis recounted, “[W]e were going to give you a citation, but now you are going to jail.” Neither officer claims that he explained to Brown that they needed her name and address from her ID in order to issue a summons, an explanation that likely would have avoided the arrest, the sidewalk struggle, the pepper spraying, and this lawsuit.
1. False Arrest Claim
Turning to the District Court’s dismissal of Brown’s claims, we consider first her claim for false arrest. The District Court concluded that the facts sufficed to arrest her “for disorderly conduct for ‘congregating] with other persons in a public place and refusing] to comply with a lawful order of the police to disperse.’ ” Brown, 2014 WL 2767232, at *6 (quoting N.Y. Penal Law § 240.20(6)). Viewing the facts in the light favorable to Brown, we are not as sure as Judge Forrest that the police officers issued an “order” to disperse. Judge Forrest cited the Defendants’ Rule 56.1 Statement of Undisputed' Facts, ¶ 46, in which they asserted that “they directed [Brown] to leave the area and ‘go home,’ ” Brown, 2014 WL 2767232, at *6 (emphasis added), but Brown’s response to that claim is that the officers told her that she “should go home,” and that these words were spoken in reply to her statement: “you don’t have anything to offer me, any advice you can offer?” Plaintiffs Statement of Undisputed Facts, ¶ 46 (emphasis added). A fact-finder considering all the evidence, including what Brown claims was the officers’ rude suggestion that she should “piss in the park,” would be entitled to conclude that advice *99 that a person should go home did not rise to the level of an order to disperse.
Nevertheless, we agree with the District Court that the false arrest claim was defeated by the officers’ qualified immunity claim, although we reach that conclusion by a different route than that taken by the District Court. Whether or not there was an “order” to disperse, the undisputed facts available to be considered likely showed probable cause to arrest for subsections 1 or 2 of section 240.20, which provide: A person is guilty of disorderly conduct when, with intent to cause public ... annoyance ..., or recklessly creating a risk thereof:
1. He engages in ... tumultuous ... behavior; or
2. He makes unreasonable noise[.]
First, it does not matter that the officers arrested for violation of subsection 6 of the disorderly conduct provision, punishing failure to disperse. “ ‘[T]he probable cause inquiry is not necessarily based upon the offense actually invoked by the arresting officer but upon whether the facts known at the time of the arrest objectively provided probable cause to arrest.’ ” Jaegly v. Couch, 439 F.3d 149, 153 (2d Cir.2006) (quoting United States v. Jones, 432 F.3d 34, 41 (1st Cir.2005)).
Second, under the “collective or imputed knowledge doctrine,” Zellner v. Summerlin, 494 F.3d 344, 369 (2d Cir.2007), “ ‘an arrest ... is permissible where the actual arresting ... officer lacks the specific information to form the basis for probable cause ... but sufficient information to justify the arrest ... was known by other law enforcement officials initiating ... the investigation.’ ” id. (quoting United States v. Colon, 250 F.3d 130, 135 (2d Cir.2001)), and the other officers “have communicated the information they possess individually, thereby pooling their collective knowledge to meet the probable cause threshold.” United States v. Chavez, 534 F.3d 1338, 1345 (10th Cir.2008).
In the pending case, the officer receiving the 911 call knew that six people were trying to get into a closed Starbucks store at 5 a.m. to use a bathroom, that they were “knocking on the door really really bad trying to get in,” and “making nasty comments,” and heard the assistant store manager tell an employee to lock the doors because he heard banging on the outside doors. That report provided probable cause to arrest whoever was outside the store asking to get in to use the bathroom. Their banging on the door provided a reasonable basis to believe that they were engaged in tumultuous behavior, especially in light of the assistant manager’s expressed concern that the doors needed to be locked.
When Officers Naimoli and Plevritis arrived at the store within minutes of hearing the dispatcher’s relay of the 911 information, saw three people still outside the store, and were told by Brown that she wanted to use the bathroom, their on-the-scene information, combined with the 911 call information, provided a reasonable basis to believe that Brown was one of the people who had been banging on the store doors and doing so with sufficient intensity to prompt the assistant manager to fear that he needed to lock the doors.. Even if these facts, collectively known by the police, did not suffice to create probable cause for a disorderly conduct arrest, it was “objectively reasonable for the officers to believe that probable cause existed,”[7] and “officers of reasonable competence *100 could disagree on whether the probable cause test was met.” Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir.1991). Those circumstances entitled the arresting officers to the defense of qualified immunity.[8] Id.
The Plaintiffs argument that New York law requires an officer’s personal observation of facts alleged to support an arrest for a violation, such as disorderly conduct, see N.Y. Penal Law §§ 10.00(1), (3), N.Y.Crim. Proc. Law 140.10(l)(a),[9] is unavailing. A defense of qualified immunity is not displaced by a violation of state law requirements. See Davis v. Scherer, 468 U.S. 183, 194 & n. 12, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); Clue v. Johnson, 179 F.3d 57, 62 n. 3 (2d Cir.1999). The officers retained a qualified immunity defense to the claim that the arrest violated the Fourth Amendment.
2. Excessive Force Claim.
The Fourth Amendment prohibits the use of excessive force in making an arrest, and whether the force used is excessive is to be analyzed under that Amendment’s “ ‘reasonableness’ standard.” Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Determining excessiveness requires “a careful balancing of the nature and quality of the intrusion on the individual’s Fourth Amendment interests against the countervailing governmental interests at stake.” Id. at 396, 109 S.Ct. 1865 (internal quotation marks omitted). This balancing, the Court noted, “requires careful attention to the facts and circumstances of each particular case, including” the following three factors:
1. “[T]he severity of the crime at issue,”
2. “whether the suspect poses an immediate threat to the safety of the officers or others,” and
3. “whether he is actively resisting arrest or attempting to evade arrest by flight.”
Id. And, the Court continued, the “ ‘reasonableness’ of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.” Id. The Court also made clear that the standard is one of objective reasonableness, and the officer’s state of mind, *101 whether evil or benign, is not relevant.[10] See id. at 397,109 S.Ct. 1865.
Unusual for a claim of excessive force, most of the relevant facts are undisputed:
• Officers Plevritis and Naimoli were arresting Brown for disorderly conduct, a violation that; under New York law, is subject to a maximum punishment of 15 days in jail.
• Officer Plevritis was 5' 10" and weighed 215 pounds; Officer Naimoli was 5' 7" and weighed 150-160 pounds; Brown was 5' 6" and weighed 120 pounds.
• Officer Plevritis asked Brown to place her hands behind her back so that they could apply handcuffs, and she refused to do so.
• One of the officers kicked Brown’s legs out from under her, causing her to fall to the ground.
• One officer succeeded in placing handcuffs on Brown’s right wrist.
• Both officers struggled with Brown, forcing her body to the ground.
• Officer Plevritis used his hand to push Brown’s face onto the pavement.
• Brown’s left arm, without a handcuff, was under her as she fell to the ground.
• The officers endeavored to take hold of Brown’s left arm and bring it behind her to complete the handcuffing.
• While on the ground, Brown did not offer her arms for handcuffing in part because she was trying to keep hold of her phone and wallet and reach for the scattered contents of her purse.
• Officer Plevritis twice administered a burst of pepper spray directly to Brown’s face.
• The officers completed the handcuffing while Brown was still on the ground.
• Officer Naimoli was aware of techniques for applying handcuffs to a reluctant arrestee, other than taking a person to the ground.
The relevant disputed facts are:
• Brown says the pepper spray was administered one foot away from her face; Officer Plevritis says the first dose was from two feet away and the second dose from three feet away. It is undisputed that the policy of the New York City Police Department instructs officers not to use pepper spray closer than three feet. See New York City Police Department Patrol Guide, Procedure No. 212-95 (Jan. 1, 2000).[11]
• Brown contends that she was trying to use her free arm to pull down her skirt, which was exposing her behind.
*102 Courts have regularly instructed that the three factors 20 identified in Graham are relevant to the required balancing of governmental interest against the intrusion upon the individual’s interests, but they have had very little to say about how this balancing is to be accomplished. Obviously, there are no numerical weights to be assigned, and the weighing metaphor has been criticized for creating the illusion of precision.[12] All that can realistically be expected is to make some assessment as to the extent to which each relevant factor is present and then somehow make an aggregate assessment of all the factors. As is true of many methods of analysis that courts prescribe, the excessive force determination is easier to describe than to make.
In this case, the severity of the crime is unquestionably slight. The disorderly conduct offense is subject to a maximum penalty of fifteen days in jail, and the underlying facts, even as alleged by the officers, are loud banging on the door of a closed store by someone wanting to use a bathroom, plus the use of loud and nasty language. With respect to the second Graham factor, Brown posed no threat whatever to the safety of the officers or others. As for actively resisting arrest, Brown was not fleeing, cf. Tennessee v. Garner, 471 U.S. 1, 6-8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), nor physically attacking an officer, cf. Sullivan v. Gagnier, 225 F.3d 161, 163 (2d Cir.2000), nor even making a move that an officer could reasonably interpret as threatening an attack, cf. Tracy v. Freshwater, 623 F.3d 90, 97 (2d Cir.2010). At most, her “resistance” was a refusal to permit the easy application of handcuffs by placing her hands behind her back. An aggregate assessment of all three relevant Graham factors would seem to point toward a determination of excessive force and, at a minimum, to preclude a ruling against the victim on a motion for summary judgment.[13]
The officers could be entitled to a summary judgment only if there existed a per se rule that an arrestee’s refusal to submit to the easy application of handcuffs always permitted police officers to use substantial force, including taking a person to the ground and incapacitating her with pepper stray, to accomplish handcuffing. We know of no such rule. Indeed, by focusing only on resistance to the arrest, such a rule would disregard the three-factor analysis that the Supreme Court required in Graham. Even resistance sufficient to result in conviction for resisting arrest does not preclude a finding of “excessive force in effectuating the arrest.” Sullivan, 225 F.3d at 166.
Here, on the undisputed facts, even shaded with the officers’ account of the episode, no reason appears why, with Brown standing, each officer could not have simply held one of her arms, brought it behind her, and put handcuffs on her wrists. Or they could have simply surrounded her, at least for a few moments, making it clear that she could not leave until she submitted to handcuffing.[14] We *103 do not mean to imply that the availability of a less aggressive way of accomplishing an arrest necessarily means that the technique that was used is thereby shown to have been excessive. Police officers must be entitled to make a reasonable selection among alternative techniques for making an arrest. But when the amount of force used by two police officers involves taking a 120-pound woman to the ground and twice spraying her directly in the face with pepper spray, the availability of a much less aggressive technique is at least relevant to making the ultimate determination of whether excessive force was used.
The assessment of a jury is needed in this case. Even though most of the facts concerning the application of force are undisputed, a jury will have to decide whether Fourth Amendment reasonableness was exceeded when Brown was taken to the ground after refusing to put her hands behind her back and when officers struggled with her on the ground and used pepper spray to accomplish handcuffing. And even if Brown’s unwillingness, while standing, to offer her hands for handcuffing and, while on the ground, to offer her left arm to complete the handcuffing is found to be resisting arrest, that nonthreatening form of resistance would be only one factor to be considered along with the minor nature of the disorderly conduct violation, the absence of actual or threatened harm to the officers, and the degree of force, including taking her to the ground and twice applying pepper spray. “The fact that a person whom a police officer attempts to arrest resists ... no doubt justifies the officer’s use of some degree of force, but it does not give the officer license to use force without limit.” Sullivan, 225 F.3d at 165-66 (emphasis in original).
The continuum along which the excessiveness of force in making an arrest is assessed is not marked by visible signposts. A court’s role in considering excessive force claims is to determine whether a jury, instructed as to the relevant factors, could reasonably find that the force used was excessive. In this case, the majority and the dissent differ on that legal issue. That division, not uncommon in cases considering the sufficiency of evidence, leaves the factual determination of excessiveness to a jury, whose collective common sense, informed by their life experiences, may well exceed that of all the members of this panel.[15]
*104 8. First Amendment Claim
Brown’s First Amendment claim — that she was arrested in retaliation for her attendance at the Occupy rally in Zuccotti Park — was properly dismissed. There is no evidence to support that claim.
Conclusion
The judgment is affirmed in part, reversed in part, and remanded for further proceedings.

. The Plaintiff "does not dispute this fact,” disputing only that she was not knocking on the doors or making nasty comments and that no one else was doing these things while she was present. See Plaintiff's Statement of Undisputed Facts, It 21.

. The dissent dismisses this crude remark as understandable "irony,” prompted by the officer's awareness that some people had urinated in Zucotti Park during "Occupy” protests. Dissenting op. 105. The first word on the vehicles of all New York City police officers is "courtesy,” not "irony.”

. "Disorderly conduct is a violation." N.Y. Penal L. § 240.20.

. " 'Violation' means an offense, other than a 'traffic infraction,’ for which a sentence to a term of imprisonment in excess of fifteen days cannot be imposed.” See N.Y. Penal Law 10.00(3); " ‘Misdemeanor’ means an offense, other than a 'traffic infraction,' for which a sentence to a term of imprisonment in excess of fifteen days may be imposed, but for which a sentence to a term of imprisonment in excess of one year cannot be imposed.” Id. 100.00(4).

.The dissent states that Brown should have ■ known that the officers needed her name and address in order to issue a summons. Dissenting op. 105. Perhaps she should have. But once the officers arrested her, they were in total control of the situation, and it is their explanation to her that would likely have avoided escalation of the episode.

. We have called such belief "arguable probable cause.” Zalaski v. City of Hartford, 723 F.3d 382, 390 (2d Cir.2013).

. The qualified immunity defense also defeats whatever claim Brown might be asserting to the initial brief detention that occurred, before announcement of the arrest, when Officer Plevritis grabbed her arm after she refused to provide an ID. Although Brown contends that she was entitled to refuse to produce an ID, her reliance on the coincidentally named case, Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), is unavailing. In that case, involving a prosecution for failure to produce an ID, the officers lacked even the “articulable suspicion,” Terry v. Ohio, 392 U.S. 1, 31, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (Harlan, J., concurring), needed for a Terry stop, see Brown, 443 U.S. at 51-52, 99 S.Ct. 2637. Here, the facts known to the officers, even if insufficient for an arrest, fully justified a Terry stop to ask for an ID, see Hiibel v. Sixth Judicial District Court, 542 U.S. 177, 185-89, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004), and necessarily supported a qualified immunity defense to a damages claim based on that stop.

. New York distinguishes between an "offense” and a "crime.” For an "offense,” which includes a "violation,” N.Y. Penal Law §§ 10.00(1), (3), a police officer may arrest a person "when he or she has reasonable cause to believe that such person has committed such offense in his or her presence.,” N.Y.Crim. Proc. Law § 140.10(l)(a). For a "crime,” which means "a misdemeanor or a felony,” N.Y. Penal Law § 10.00(6), a police officer may arrest a person "when he or she has reasonable cause to believe that such has •committed such crime, whether in his or her presence or otherwise, N.Y.Crim. Proc. Law § 140.10(l)(b).

. Thus, it is not relevant whether the officers thought the amount of force used was really necessary or were provoked to use that amount of force because of the abusive language they contend Brown directed at-them. In this respect, a claimed Fourth Amendment violation for using excessive force while making an arrest differs from a claimed Eighth Amendment violation for abusing a prisoner. See Whitley v. Albers, 475 U.S. 312, 320-21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (Eighth Amendment analysis turns on “whether force was applied [to prisoner] ... maliciously and sadistically for the very purpose of causing harm.”).

. The dissent suggests that the Patrol Guide standard is not relevant because the excessive force standard derives from the Constitution. Dissenting op. [7]. But the Supreme Court in Tennessee v. Gamer, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), considered police regulations of several jurisdictions in making a constitutional ruling on excessive force, see id. at 18-19, 105 S.Ct. 1694, and regulations of a single department have also been considered relevant to a constitutional ruling on excessive force, see, e.g., Ludwig v. Anderson, 54 F.3d 465, 472 (8th Cir.1995); Maddox v. City of Los Angeles, 792 F.2d 1408, 1414 (9th Cir.1986).

. Salomaa v. Honda Long Term Disability Plan, 642 F.3d 666, 675 (9th Cir.2011); McEvoy v. Spencer, 124 F.3d 92, 98 n. 3 (2d Cir.1997); Ford Motor Co. v. Ryan, 182 F.2d 329, 331-32 (2d Cir.1950).

. The dissent concludes that the force used was not excessive by focusing exclusively on the fact that Brown was resisting arrest (albeit in a minimal way). Dissenting op. 107-10. The dissent's "balancing'' assigns no weight at all to the other Graham factors: the minor nature of Brown's offense and the absence of any actual or threatened injury of the officers.

.The dissent suggests that pointing out the minor nature of Brown’s offense, which is a relevant Graham factor, leads to "freefing] suspects resisting arrest for minor offenses.” *103 Dissenting op. 109. The available means of effecting Brown's arrest with less aggressive force dispel that claim.

. The dissent speculates, without any support in the record, that, in the event that a jury finds the police officers liable, the judgment will be paid out of their children’s college funds. Dissenting op. 107. For support, the author of the dissent cites only his own previous speculation, see Gonzalez v. City of Schenectady, 728 F.3d 149, 162 (2d Cir.2013).
A far more likely speculation is that a payment, if any, will be made by the City after a settlement. See, e.g., "New York City Settles With 6 Occupy Wall Street Protesters Pepper-Sprayed by the Police,” New York Times, July 6, 2015. And, if a jury were to hold the officers liable for damages, payment is almost certainly going to be made by the City by way of indemnification or by the police union. See Richard Emery & Ilian Margalit Maazel, Why Civil Rights Lawsuits Do Not Deter Police Misconduct: The Conundrum of Indemnification and a Proposed Solution, 28 Fordham Urban L.J. 587 n. 2 (2000). A study for the six years from 2006 to 2011 revealed that $348,274,595.81 was awarded in civil rights settlements and judgments against New York City police officers, of which $114,000 (0.03 percent) was required to be paid by police officers, and the study does not indicate whether some or all of even this amount was paid by the police union. See Joanna C. Schwartz, Police Indemnification, 89 N.Y.U. L.Rev. 885, 913, 962 (2014).