Brown v. City of New York

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2014

Heard: June 17, 2015                    Decided: August 19, 2015

Docket No. 14-2611

- - - - - - - - - - - - - - - - - - - - - - - - -

IMANI BROWN,
        Plaintiff-Appellant,

                    v.

CITY OF NEW YORK, a municipal entity,
JUSTIN NAIMOLI, in his individual capacity,
THEODORE PLEVRITIS, in his individual capacity,
        Defendants-Appellees[1]

- - - - - - - - - - - - - - - - - - - - - - - - -

Before: NEWMAN, JACOBS, and CALABRESI, <u>Circuit Judges</u>.

Appeal from the June 18, 2014, judgment of the United States District Court for the Southern District of New York (Katherine B. Forrest, District Judge), dismissing on motion for summary judgment, a complaint primarily alleging false arrest and use of excessive force.

Affirmed in part, reversed in part, and remanded. Judge Jacobs concurs in the judgment in part and dissents in part with a separate opinion.

---

[1] The Clerk is directed to conform the official caption to the caption in this opinion.

Joshua S. Moskovitz, Beldock Levine &
Hoffman LLP, New York, NY (Jonathan
C. Moore, Beldock Levine & Hoffman
LLP, New York, NY, on the brief),
for Appellant.

Julie Steiner, Asst. Corp. Counsel,
New York, NY (Zachary W. Carter,
Corp. Counsel of the City of New
York, New York, NY, on the brief),
for Appellees.

JON O. NEWMAN, <u>Circuit Judge</u>.

A pre-dawn sidewalk conversation between police officers and a member of the public that began with a request for help finding a bathroom escalated into a confrontation, an arrest, a struggle, a use of force and pepper spray, a lawsuit, and now this appeal from dismissal of the lawsuit. Imani Brown appeals from the June 18, 2014, judgment of the District Court for the Southern District of New York (Katherine B. Forrest, District Judge), granting a motion for summary judgment by New York City police officers Justin Naimoli and Theodore Plevritis and the City of New York.

We conclude that Brown's claim against the officers for unlawful arrest is defeated by their defense of qualified immunity, her First Amendment claim was properly dismissed as

-2-

lacking any merit, and her claim against them for use of excessive force must be remanded for trial. We have no occasion to consider Brown's claims against the City because her brief on appeal does not challenge the dismissal of those claims. We therefore affirm in part, reverse in part, and remand.

## Background

Several facts are undisputed, and, on this appeal from the grant of the Defendants' motion for summary judgment, those that are disputed must be viewed in the light most favorable to the Plaintiff, Imani Brown. *See Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011).

On the night of November 15, 2011, an Occupy Wall Street crowd gathered in Zuccotti Park in lower Manhattan. Brown received a text message saying that the park had been raided. She went to observe around 2 a.m. and left around 5 a.m. to find a bathroom. Two blocks away, she came to a Starbucks store and spoke to an employee who told her that the store was closed but would open at 5:30, which was 15 or 20 minutes later. She remained on the sidewalk, intending to wait until the store opened.

That night Officers Naimoli and Plevritis were working the 11:15 p.m. to 7:50 a.m. shift. They drove by Zuccotti Park as

the crowd was being cleared. They arrested a man who was blocking traffic and after taking him to Central Booking resumed their patrol around 4 a.m.

At 5:05 a.m., an assistant manager of the Starbucks store called 911 and reported six people knocking on the door of his closed store, trying to get in to use the bathroom. He said that they were "knocking on the door really really bad trying to get in," and "making nasty comments." Defendants' Statement of Undisputed Facts, ¶ 21.[2] The 911 operator heard the assistant manager tell an employee to lock the bathroom door from the outside because he heard "banging on the doors . . . [t]he outside doors." Exhibit 16 (911 call transcript). A radio dispatcher immediately relayed the substance of the 911 call to Officers Naimoli and Plevritis, stating in part, "[S]ix people banging on the doors refusing to leave at Starbucks coffee." Hearing the transmission, Naimoli and Plevritis drove to the store location, arriving there within minutes of the 911 call.

From this point on, most of the facts, as recounted in depositions and testimony at a civilian complaint hearing, are

---

[2] The Plaintiff "does not dispute this fact," disputing only that she was not knocking on the doors or making nasty comments and that no one else was doing these things while she was present. *See* Plaintiff's Statement of Undisputed Facts, ¶ 21.

in dispute. We continue with Brown's version. When the officers arrived, only she and two other persons were waiting near the Starbucks store. Brown approached the police car, gestured to have the window rolled down, and spoke to the officers through the passenger side front window. Brown asked if the officers knew where she could find a bathroom.

One officer answered her question with a question of his own, "What do we look like, the potty police?" Brown asked her question again. One officer answered that Brown should "piss in the park."[3] Brown asked whether that would be illegal and was told that it would be. Brown then said, "[S]o you are just not going to help me, you don't have anything you can offer me, any advice you can offer?" One officer, still in the police car, then told Brown that she "should go home." She responded that she lived over an hour away and preferred to wait until the Starbucks opened.

As Brown walked away from the police car, the officers got out of the police car and asked for her ID. She repeatedly asked why they wanted it, they gave no explanation, and she refused to

_____

[3] The dissent dismisses this crude remark as understandable "irony," prompted by the officer's awareness that some people had urinated in Zucotti Park during "Occupy" protests. Dissenting op. **[5]**. The first word on the vehicles of all New York City police officers is "courtesy," not "irony."

-5-

provide any ID.  As Officer Plevritis acknowledged in his deposition, he then grabbed Brown and said to her, "[G]ive me your identification or you're going to be placed under arrest." When she again refused, he told her, "You're under arrest." Brown repeatedly asked why she was being arrested but received no explanation.  One or both of the officers then grabbed her arm, held it behind her back, and attempted to apply handcuffs. An officer kicked her legs out from under her, and she fell to her knees.  A videotape shows that handcuffs had been placed on one of Brown's wrists before she was thrown to the ground.  On the ground, Brown reached with her other arm for her phone, wallet, and scattered contents of her purse.

The videotape shows both officers on the ground, endeavoring to bring her free arm behind her in order to complete the handcuffing.  The videotape shows a struggle with considerable shouting by Brown, the officers, and a bystander.

Officer Plevritis administered a burst of pepper spray directly to Brown's face.  When Brown realized her skirt had come up and "that [her] bottom was exposed,", she ask if the officers could pull her skirt down.  They prudently declined, one of them answering, "No, it wouldn't have been like that, if you weren't causing trouble."  When asked what she then did, Brown said she

was "reaching with my free arm trying to pull my skirt down." As the struggle to handcuff Brown continued, Officer Plevritis administered a second burst of pepper stray directly in her face from a distance of one foot.

The officers then completed the handcuffing, raised Brown to her feet, placed her in the police car, and drove her to a police station.

The officers' arrest report stated that Brown "was *asked* to leave . . . after causing a disturbance in front of a store" and "refuse[d] to give ID and responded with profanity." Document 54-11 (emphasis added). Her arrest was stated to be for "refusing to move on" in violation of the disorderly conduct provision, subsection 6, of N.Y. Penal Law § 240.20. Later, Officer Naimoli spoke with an assistant district attorney who prepared a criminal complaint. That complaint charged Brown with violating subsections (1) and (3) of Penal Law § 240.20 by "engag[ing] in fighting and in violent, tumultuous and threatening behavior" and "us[ing] abusive and obscene language . . . in a public place" "with intent to cause public inconvenience, annoyance and alarm, and recklessly causing a risk thereof." The complaint, which Officer Naimoli signed under oath, alleged that he personally observed Brown "banging on the door of Starbucks and screaming"

-7-

and that her conduct "caused a crowd to gather and people to express alarm."  Officer Naimoli later admitted in his deposition that he did not personally observe Brown banging on the door of Starbucks and that he did not see her yelling at a Starbucks employee.

After the criminal complaint was dismissed, Brown filed suit under 42 U.S. C. § 1983, alleging claims for false arrest and use of excessive force in violation of the Fourth Amendment, and retaliation in violation of the First Amendment.  The District Court ultimately granted the Defendants' motion for summary judgment, concluding that "[q]ualified immunity insulates defendants from liability on [Brown's] First and Fourth Amendment claims," *Brown v. City of New York*, No. 13-cv-1018, 2014 WL 2767232, at *10 (June 18, 2014), because "even if probable cause did not actually exist," "the officers *directed* plaintiff to leave the area and go home, but plaintiff decided not to leave the area, and told the officers that she could not go home," *Brown,* 2014 WL 2767232, at *9 (emphasis added), and "[t]hus it was objectively reasonable for the officer[s] to believe that probable cause existed to arrest [Brown]," *id*.  The Court also granted summary judgment for the Defendants on the excessive force claim, concluding that their use of force was "reasonable

-8-

under the circumstances." *Id.* at *8.

Discussion

Before considering the legal issues on appeal, we pause to observe that, even on the officers' version of the events, the arrest, the ensuing scuffle, and this lawsuit could very likely have been avoided if the police had explained to Brown why they were asking for her ID. Commendably, the officers initially intended to issue a summons, rather than make an arrest, for an offense, disorderly conduct, that was only a "violation" under New York law,[4] an offense category less serious than even a "misdemeanor."[5] To use the summons procedure, they needed to know Brown's name and address. Their request for her to produce some ID was entirely appropriate. So was her repeated inquiry, "[O]n what grounds?"

At that point, the officers could have explained that they needed her name and address from her ID in order to issue a

---

[4] "Disorderly conduct is a violation." N.Y. Penal L. § 240.20.

[5] "'Violation' means an offense, other than a 'traffic infraction,' for which a sentence to a term of imprisonment in excess of fifteen days cannot be imposed." *See* N.Y. Penal Law 10.00(3); "'Misdemeanor' means an offense, other than a 'traffic infraction,' for which a sentence to a term of imprisonment in excess of fifteen days may be imposed, but for which a sentence to a term of imprisonment in excess of one year cannot be imposed." *Id.* 100.00(4).

summons.[6] Instead, as Officer Plevritis admitted in his deposition, he grabbed Brown before he told her she was going to get a summons. Then, still giving her no reason why they wanted her ID, they told her only, as Officer Plevritis recounted, "[W]e were going to give you a citation, but now you are going to jail." Neither officer claims that he explained to Brown that they needed her name and address from her ID in order to issue a summons, an explanation that likely would have avoided the arrest, the sidewalk struggle, the pepper spraying, and this lawsuit.

1. False Arrest Claim

Turning to the District Court's dismissal of Brown's claims, we consider first her claim for false arrest. The District Court concluded that the facts sufficed to arrest her "for disorderly conduct for 'congregat[ing] with other persons in a public place and refus[ing] to comply with a lawful order of the police to disperse.'" *Brown*, 2014 2767232, at *6 (quoting N.Y. Penal Law § 240.20(6)). Viewing the facts in the light favorable to Brown,

_____

[6] The dissent states that Brown should have known that the officers needed her name and address in order to issue a summons. Dissenting op. **[6]**. Perhaps she should have. But once the officers arrested her, they were in total control of the situation, and it is their explanation to her that would likely have avoided escalation of the episode.

we are not as sure as Judge Forrest that the police officers issued an "order" to disperse. Judge Forrest cited the Defendants' Rule 56.1 Statement of Undisputed Facts, ¶ 46, in which they asserted that "they *directed* [Brown] to leave the area and 'go home,'" *Brown*, 2014 WL 2767232, at *6 (emphasis added), but Brown's response to that claim is that the officers told her that she "should go home," and that these words were spoken in reply to her statement: "you don't have anything to offer me, any *advice* you can offer?" Plaintiff's Statement of Undisputed Facts, ¶ 46 (emphasis added). A fact-finder considering all the evidence, including what Brown claims was the officers' rude suggestion that she should "piss in the park," would be entitled to conclude that *advice* that a person *should* go home did not rise to the level of an *order* to disperse.

Nevertheless, we agree with the District Court that the false arrest claim was defeated by the officers' qualified immunity claim, although we reach that conclusion by a different route than that taken by the District Court. Whether or not there was an "order" to disperse, the undisputed facts available to be considered likely showed probable cause to arrest for subsections 1 or 2 of section 240.20, which provide:

A person is guilty of disorderly conduct when, with

intent to cause public . . . annoyance . . ., or
recklessly creating a risk thereof:

    1. He engages in . . . tumultuous . . . behavior;
or

    2. He makes unreasonable noise[.]

First, it does not matter that the officers arrested for violation of subsection 6 of the disorderly conduct provision, punishing failure to disperse. "'[T]he probable cause inquiry is not necessarily based upon the offense actually invoked by the arresting officer but upon whether the facts known at the time of the arrest objectively provided probable cause to arrest.'" *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006) (quoting *United States v. Jones*, 432 F.3d 34, 41 (1st Cir. 2005)).

Second, under the "collective or imputed knowledge doctrine," *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007, "'an arrest . . . is permissible where the actual arresting . . . officer lacks the specific information to form the basis for probable cause . . . but sufficient information to justify the arrest . . . was known by other law enforcement officials initiating . . . the investigation.'" *id.* (quoting *United States v. Colon*, 250 F.2d 130, 135 (2d Cir. 2001)), and the other officers "have communicated the information they possess

-12-

individually, thereby pooling their collective knowledge to meet the probable cause threshold." *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008).

In the pending case, the officer receiving the 911 call knew that six people were trying to get into a closed Starbucks store at 5 a.m. to use a bathroom, that they were "knocking on the door really really bad trying to get in," and "making nasty comments," and heard the assistant store manager tell an employee to lock the doors because he heard banging on the outside doors. That report provided probable cause to arrest whoever was outside the store asking to get in to use the bathroom. Their banging on the door provided a reasonable basis to believe that they were engaged in tumultuous behavior, especially in light of the assistant manager's expressed concern that the doors needed to be locked.

When Officers Naimoli and Plevritis arrived at the store within minutes of hearing the dispatcher's relay of the 911 information, saw three people still outside the store, and were told by Brown that she wanted to use the bathroom, their on-the-scene information, combined with the 911 call information, provided a reasonable basis to believe that Brown was one of the

-13-

people who had been banging on the store doors and doing so with sufficient intensity to prompt the assistant manager to fear that he needed to lock the doors. Even if these facts, collectively known by the police, did not suffice to create probable cause for a disorderly conduct arrest, it was "objectively reasonable for the officers to believe that probable cause existed,"[7] and "officers of reasonable competence could disagree on whether the probable cause test was met." *Golino v. Ciy of New Haven*, 950 F.3d 864, 870 (2d Cir. 1991). Those circumstances entitled the arresting officers to the defense of qualified immunity.[8] *Id.*

The Plaintiff's argument that New York law requires an officer's personal observation of facts alleged to support an arrest for a violation, such as disorderly conduct, *see* N.Y.

---

[7] We have called such belief "arguable probable cause." *Zaleski v. City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013).

[8] The qualified immunity defense also defeats whatever claim Brown might be asserting to the initial brief detention that occurred, before announcement of the arrest, when Officer Plevritis grabbed her arm after she refused to provide an ID. Although Brown contends that she was entitled to refuse to produce an ID, her reliance on the coincidentally named case, *Brown v. Texas*, 443 U.S. 47 (1979), is unavailing. In that case, involving a prosecution for failure to produce an ID, the officers lacked even the "articulable suspicion," *Terry v. Ohio*, 392 U.S. 1, 31 (1968) (Harlan, J., concurring), needed for a *Terry* stop, *see Brown*, 443 U.S. at 51-52. Here, the facts known to the officers, even if insufficient for an arrest, fully justified a *Terry* stop to ask for an ID, *see Hiibel v. Sixth Judicial District Court*, 542 U.S. 177, 185-89 (2004), and necessarily supported a qualified immunity defense to a damages claim based on that stop.

-14-

Penal Law §§ 10.00(1), (3), N.Y. Crim. Proc. Law 140.10(1)(a),[9] is unavailing. A defense of qualified immunity is not displaced by a violation of state law requirements. *See Davis v. Scherer*, 468 U.S. 183, 194 & n.12 (1984); *Clue v. Johnson*, 179 F.3d 57, 62 n.3 (2d Cir. 1999). The officers retained a qualified immunity defense to the claim that the arrest violated the Fourth Amendment.

2. Excessive Force Claim.

The Fourth Amendment prohibits the use of excessive force in making an arrest, and whether the force used is excessive is to be analyzed under that Amendment's "'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). Determining excessiveness requires "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotation marks omitted). This

---

[9] New York distinguishes between an "offense" and a "crime." For an "offense," which includes a "violation," N.Y. Penal Law §§ 10.00(1), (3), a police officer may arrest a person "when he or she has reasonable cause to believe that such person has committed such offense in his or her presence.," N.Y. Crim. Proc. Law § 140.10(1)(a). For a "crime," which means "a misdemeanor or a felony," N.Y. Penal Law § 10.00(6), a police officer may arrest a person "when he or she has reasonable cause to believe that such has committed such crime, whether in his or her presence or otherwise, N.Y. Crim. Proc. Law § 140.10(1)(b).

balancing, the Court noted, "requires careful attention to the facts and circumstances of each particular case, including" the following three factors:

1. "[T]he severity of the crime at issue,"

2. "whether the suspect poses an immediate threat to the safety of the officers or others," and

3. "whether he is actively resisting arrest or attempting to evade arrest by flight."

*Id.* And, the Court continued, the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* The Court also made clear that the standard is one of objective reasonableness, and the officer's state of mind, whether evil or benign, is not relevant.[10] *See id.* at 397.

Unusual for a claim of excessive force, most of the relevant facts are undisputed:

---

[10] Thus, it is not relevant whether the officers thought the amount of force used was really necessary or were provoked to use that amount of force because of the abusive language they contend Brown directed at them. In this respect, a claimed Fourth Amendment violation for using excessive force while making an arrest differs from a claimed Eighth Amendment violation for abusing a prisoner. See *Whitley v. Albers*, 475 U.S. 312, 320-21 (Eighth Amendment analysis turns on "whether force was applied [to prisoner] . . . maliciously and sadistically for the very purpose of causing harm.").

• Officers Plevritis and Naimoli were arresting Brown for disorderly conduct, a violation that; under New York law, is subject to a maximum punishment of 15 days in jail.

• Officer Plevritis was 5' 10" and weighed 215 pounds; Officer Naimoli was 5' 7" and weighed 150-160 pounds; Brown was 5' 6" and weighed 120 pounds.

• Officer Plevritis asked Brown to place her hands behind her back so that they could apply handcuffs, and she refused to do so.

• One of the officers kicked Brown's legs out from under her, causing her to fall to the ground.

• One officer succeeded in placing handcuffs on Brown's right wrist.

• Both officers struggled with Brown, forcing her body to the ground.

• Officer Plevritis used his hand to push Brown's face onto the pavement.

• Brown's left arm, without a handcuff, was under her as she fell to the ground.

• The officers endeavored to take hold of Brown's left arm and bring it behind her to complete the handcuffing.

• While on the ground, Brown did not offer her arms for handcuffing in part because she was trying to keep hold of her phone and wallet and reach for the scattered contents of her purse.

• Officer Plevritis twice administered a burst of pepper spray directly to Brown's face.

-17-

• The officers completed the handcuffing while Brown was still on the ground.

• Officer Naimoli was aware of techniques for applying handcuffs to a reluctant arrestee, other than taking a person to the ground.

The relevant disputed facts are:

• Brown says the pepper spray was administered one foot away from her face; Officer Plevritis says the first dose was from two feet away and the second dose from three feet away. It is undisputed that the policy of the New York City Police Department instructs officers not to use pepper spray closer than three feet. *See* New York City Police Department Patrol Guide, Procedure No. 212-95 (Jan. 1, 2000).[11]

• Brown contends that she was trying to use her free arm to pull down her skirt, which was exposing her behind.

Courts have regularly instructed that the three factors identified in *Graham* are relevant to the required balancing of governmental interest against the intrusion upon the individual's interests, but they have had very little to say about how this balancing is to be accomplished. Obviously, there are no

_____

[11] The dissent suggests that the Patrol Guide standard is not relevant because the excessive force standard derives from the Constitution. Dissenting op. **[7]**. But the Supreme Court in *Garner v. Tennessee*, 471 U.S. 1 (1985), considered police regulations of several jurisdictions in making a constitutional ruling on excessive force, *see id.* at 18-19, and regulations of a single department have also been considered relevant to a constitutional ruling on excessive force, *see, e.g., Ludwig v. Anderson*, 54 F.3d 465, 472 (8th Cir. 1995); *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1414 (9th Cir. 1986).

-18-

numerical weights to be assigned, and the weighing metaphor has been criticized for creating the illusion of precision.[12]  All that can realistically be expected is to make some assessment as to the extent to which each relevant factor is present and then somehow make an aggregate assessment of all the factors.  As is true of many methods of analysis that courts prescribe, the excessive force determination is easier to describe than to make.

In this case, the severity of the crime is unquestionably slight.  The disorderly conduct offense is subject to a maximum penalty of fifteen days in jail, and the underlying facts, even as alleged by the officers, are loud banging on the door of a closed store by someone wanting to use a bathroom, plus the use of loud and nasty language.  With respect to the second *Graham* factor, Brown posed no threat whatever to the safety of the officers or others.  As for actively resisting arrest, Brown was not fleeing, *cf*. *Garner v. Tennessee*, 471 U.S. 1, 6-8 (1985), nor physically attacking an officer, *cf. Sullivan v. Gagnier*, 225 F.3d 161, 163 (2d Cir. 2000), nor even making a move that an officer could reasonably interpret as threatening an attack, *cf*. *Tracy v. Freshwater*, 623 F.3d 90, 97 (2d Cir. 2010).  At most,

---

[12] *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 675 (9th Cir. 2011); *McEvoy v. Spencer*, 124 F.3d 92, 98 n.3 (2d Cir. 1997); *Ford Motor Co. v. Ryan*, 182 F.2d 329, 331-32 (2d Cir. 1950).

-19-

her "resistance" was a refusal to permit the easy application of handcuffs by placing her hands behind her back. An aggregate assessment of all three relevant *Graham* factors would seem to point toward a determination of excessive force and, at a minimum, to preclude a ruling against the victim on a motion for summary judgment.[13]

The officers could be entitled to a summary judgment only if there existed a *per se* rule that an arrestee's refusal to submit to the easy application of handcuffs always permitted police officers to use substantial force, including taking a person to the ground and incapacitating her with pepper stray, to accomplish handcuffing. We know of no such rule. Indeed, by focusing only on resistance to the arrest, such a rule would disregard the three-factor analysis that the Supreme Court required in *Graham*. Even resistance sufficient to result in conviction for resisting arrest does not preclude a finding of "excessive force in effectuating the arrest." *Sullivan*, 225 F.3d at 166.

_____

[13] The dissent concludes that the force used was not excessive by focusing exclusively on the fact that Brown was resisting arrest (albeit in a minimal way). Dissenting op. **[11-19]**. The dissent's "balancing" assigns no weight at all to the other *Graham* factors: the minor nature of Brown's offense and the absence of any actual or threatened injury of the officers.

Here, on the undisputed facts, even shaded with the officers' account of the episode, no reason appears why, with Brown standing, each officer could not have simply held one of her arms, brought it behind her, and put handcuffs on her wrists. Or they could have simply surrounded her, at least for a few moments, making it clear that she could not leave until she submitted to handcuffing.[14] We do not mean to imply that the availability of a less aggressive way of accomplishing an arrest necessarily means that the technique that was used is thereby shown to have been excessive. Police officers must be entitled to make a reasonable selection among alternative techniques for making an arrest. But when the amount of force used by two police officers involves taking a 120-pound woman to the ground and twice spraying her directly in the face with pepper spray, the availability of a much less aggressive technique is at least relevant to making the ultimate determination of whether excessive force was used.

The assessment of a jury is needed in this case. Even though most of the facts concerning the application of force are

---

[14] The dissent suggests that pointing out the minor nature of Brown's offense, which is a relevant *Graham* factor, leads to "free[ing] suspects resisting arrest for minor offenses." Dissenting op. **[17]**. The available means of effecting Brown's arrest with less aggressive force dispel that claim.

-21-

undisputed, a jury will have to decide whether Fourth Amendment reasonableness was exceeded when Brown was taken to the ground after refusing to put her hands behind her back and when officers struggled with her on the ground and used pepper spray to accomplish handcuffing. And even if Brown's unwillingness, while standing, to offer her hands for handcuffing and, while on the ground, to offer her left arm to complete the handcuffing is found to be resisting arrest, that non-threatening form of resistance would be only one factor to be considered along with the minor nature of the disorderly conduct violation, the absence of actual or threatened harm to the officers, and the degree of force, including taking her to the ground and twice applying pepper spray. "The fact that a person whom a police officer attempts to arrest resists . . . no doubt justifies the officer's use of *some* degree of force, but it does not give the officer license to use force without limit." *Sullivan*, 225 F.3d at 165-66 (emphasis in original).

The continuum along which the excessiveness of force in making an arrest is assessed is not marked by visible signposts. A court's role in considering excessive force claims is to determine whether a jury, instructed as to the relevant factors, could reasonably find that the force used was excessive. In this

case, the majority and the dissent differ on that legal issue. That division, not uncommon in cases considering the sufficiency of evidence, leaves the factual determination of excessiveness to a jury, whose collective common sense, informed by their life experiences, may well exceed that of all the members of this panel.[15]

3. First Amendment Claim

Brown's First Amendment claim – that she was arrested in retaliation for her attendance at the Occupy rally in Zuccotti Park – was properly dismissed.  There is no evidence to support

---

[15] The dissent speculates, without any support in the record, that, in the event that a jury finds the police officers liable, the judgment will be paid out of their children's college funds. Dissenting op. **[12]**.  For support, the author of the dissent cites only his own previous speculation, *see Gonzalez v. City of Schenectady*, 728 F.3d 149, 162 (2d Cir. 2013).

A far more likely speculation is that a payment, if any, will be made by the City after a settlement. *See, e.g.,* "New York City Settles With 6 Occupy Wall Street Protesters Pepper-Sprayed by the Police," *New York Times*, July 6, 2015.  And, if a jury were to hold the officers liable for damages, payment is almost certainly going to be made by the City by way of indemnification or by the police union. *See Richard* Emery & Illan Margalit Maazel, *Why Civil Rights Lawsuits Do Not Deter Police Misconduct: The Conundrum of Indemnification and a Proposed Solution*, 28 Fordham Urban L. J. 587 n. 2 (2000).  A study for the six years from 2006 to 2011 revealed that $348,274,595.81 was awarded in civil rights settlements and judgments against New York City police officers, of which $114,000 (0.03 percent) was required to be paid by police officers, and the study does not indicate whether some or all of even this amount was paid by the police union. *See* Joanna C. Schwartz, *Police Indemnification*, 89 N.Y.U. L. Rev. 885, 913, 962 (2014).

that claim.

## Conclusion

The judgment is affirmed in part, reversed in part, and remanded for further proceedings.

DENNIS JACOBS, <u>Circuit Judge</u>, concurring in the judgment in part and dissenting in part:

I concur in the judgment insofar as the majority affirms dismissal of the First Amendment retaliation claim and the claim for false arrest.

As to the claim of excessive force, the majority remands for a jury trial to determine whether the officers' use of force, in restraining a suspect who was actively resisting arrest, was so objectively unreasonable that it violated the Fourth Amendment to the United States Constitution--and, accordingly, whether two officers of the New York City Police Department ("NYPD") should be personally liable to her for money damages. From that regrettable decision, I respectfully dissent.

## I

As the majority characterizes its recitation of the facts, those in dispute are presented "in the light most favorable to the Plaintiff, Imani Brown." Maj. Op. at 3. But the only facts relevant to the use of force are undisputed, and are captured by high-quality video footage. The majority essentially concedes as much. <u>See</u>

1

Maj. Op. at 16 ("Unusual for a claim of excessive force, most of the relevant facts are undisputed.").  As to the visual record, "[t]here are no allegations . . . that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened."  Scott v. Harris, 550 U.S. 372, 378 (2007).  Brown's excessive force claim therefore must be considered at summary judgment "in the light depicted by the videotape."  Id. at 380-81.

Brown's claim does not survive the witness of your eyes.  Since I am "happy to allow the videotape to speak for itself," id. at 378 n.5, I have made the footage available online.[1]  A textual play-by-play of the video is supplied in an Appendix to this opinion.  As to the use of force, the only source of the facts I rely upon (other than the video) is Brown's own testimony.

The majority and I mostly agree on what happened in the prequel to the video.  Around 5 a.m., the manager of a Starbucks in lower Manhattan called 911.  The Starbucks had not yet opened, and people were banging on the glass

---

[1]    The clearest, longest video is available at the following link: http://www.ca2.uscourts.gov/Docs/Pl's_Ex%2018_OWSCraigCard7-65.mp4 See Ex. 18 to Decl. of Joshua S. Moskovitz ("Video").  Two shorter videos provide some additional context.  See Ex. L to Decl. of Andrew Lucas; Ex. 20 to Decl. of Joshua S. Moskovitz.  All of the video footage is available for download on the "Multimedia Resources" section of the Court website's "Decisions" page. See http://www.ca2.uscourts.gov/multimedia_resources.html

2

demanding access to the bathroom. The coffee shop was five blocks from Zuccotti Park, where anti-Wall Street demonstrators had been camped for some days. Two NYPD officers were despatched to the Starbucks. They parked close by, and observed a group gathered in front of the coffee shop. Brown approached the police car and made known that she was among those seeking entry; specifically, she asked police guidance about where she could find an open bathroom. Apparently, the police did not consider giving such advice to be among their duties. When Brown went back to the door, the police approached her. As the majority concludes, the police had at least arguable probable cause for arrest.

When the police asked her for identification, she balked, and thereby prevented the encounter from being resolved on the basis of a summons. When the officers then demanded that Brown present her hands to be cuffed for arrest, she again balked, this time grabbing hold of a metal bar of the scaffolding erected in front of the store. The video begins there.

As the video evidences: Brown resisted arrest; the police subdued her using modulated, graduated levels of force; she was warned at each stage what measure would follow; she was spoken to with forceful professionalism

3

throughout; the first short release of pepper spray was preceded by a warning; the pepper spray had no apparent effect on her resistance; she was warned that a further burst would be administered; she was undeterred; and only shortly after the second application did she allow her hands to be cuffed. After she complied, she was lead to the back seat of a police car; when she emerged a few moments later, her hands were no longer cuffed together. As she admitted at deposition, she fully understood the orders that she resisted:

> Q. In sum and substance, were they telling you to give them your hands?
>
> A. Yes.
>
> Q. In sum and substance, were they telling you to stop resisting?
>
> A. They did, yes.

Ex. F to Lucas Decl. ("Dep. of Imani Brown"), 52:25-53:5. That documented sequence of events is all that is needed to affirm summary judgment on the excessive-force claim.

The majority opinion does not actually question that storyline, but it injects criticisms of police technique and tone that seem to me mostly irrelevant, and awfully unfair:

4

- The majority compares Brown's height and weight (and sex) to the height and weight (and sex) of the two policemen, with more than a suggestion that their struggle to subdue her was unsporting and unchivalrous or (alternatively) insufficiently masterful and competent. See, e.g., Maj. Op. at 21 (criticizing the police for "taking a 120-pound woman to the ground and twice spraying her directly in the face with pepper spray"); see also id. at 17 (listing Brown's and the officers' height and weight). The size comparison sharply cuts the other way, of course. Brown was outnumbered by trained NYPD officers who were bigger than she was: the easy inference is that, but for their professional restraint, they could have subdued her promptly and completely with effortless brutality.

- The majority cites the answers made by the NYPD officers to Brown's request for guidance on local toilet facilities. One answered, "What do we look like, the potty police?" The other suggested she "piss in the park." (Of course, as had been widely reported, Zuccotti Park had been turned into something like an open sewer by those

5

who had been encamped there; so the police responses might be deemed a commentary on Brown and the others in her group. The police should be free to perceive irony from a self-imagined revolutionary against corporate America who was begging relief at Starbucks Corporation.) But rudeness or sarcasm (even excessive rudeness or sarcasm) is not force, let alone excessive force.

- The majority faults the police for not resolving the encounter on the basis of a summons. But it was Brown's refusal to identify herself that foreclosed that option. The majority thinks the police should have then explained why they wanted her name, and assumes (without basis) that it is "very likely," Maj. Op. at 9, that the encounter would have resolved itself peacefully had this information been adequately communicated. But it was sufficiently obvious why the police wanted identification; she could scarcely have thought that they wanted to send her tickets to the policemen's ball.

6

- The majority implies that the pepper spray was held too close to Brown, and that good policing technique would call for more distance. See Maj. Op. at 18 (citing the New York City Police Department Patrol Guide). But at least the first burst was issued when the officer holding the can was holding on to Brown at the same time, so that he could not have further distanced the spray-can without a selfie stick. In any event, we are not interpreting the NYPD Patrol Guide, but the United States Constitution, which has nothing to say about the optimal distance from which an officer should discharge pepper spray during a physical struggle. Moreover, the first discharge was insufficient to overcome resistance; the second eventually subdued her; and at the precinct afterward, she declined the opportunity to wash out her eyes.

- My colleagues lament that the whole episode could have been avoided if the police had done this or that, or used some other technique. Maj. Op. at 9, 10 n.6, 21. But surely the but-for cause of the tussle was Brown, her refusal to give pedigree information

7

needed for a summons, and her dogged resistance to the lawful arrest she had provoked by her violation of the law.

In summary, the police had probable cause to arrest; they were refused identification that could have obviated any physical encounter; and they applied modulated force and gave warnings in advance at each step, treating Brown with all the courtesy a criminal suspect can reasonably ask for while physically resisting arrest. Moreover, the entire encounter, from first to last, apparently had little adverse effect on Brown, physically or psychologically. When she arrived at the police station, she explicitly refused medical assistance. Asked by a member of the Emergency Medical Services team if she wanted her eyes rinsed, Brown declined.

The day after her arrest, Brown was happily claiming the glamor of having spent a night in jail after resisting arrest. In an online chat with a friend, Brown gloated:

> Friend:  imanii you aiight?
>
> Brown:  yeah
>
> Brown:  I was maced and shit tho

Friend:    woahh

Friend:    u jusst refused to move?

Brown:    yes it's a long story

Brown:    I resisted arrest

Ex. 1 to Supp. Decl. of Andrew Lucas.  The next day, another friend asked Brown

if she planned to return to the protests:

Friend:    are you going to keep protesting?

Brown:    of course

Brown:    I just was going to lay low tonight

Brown:    I was just released yesterday am

Brown:    but now I'm regretting going home

Brown:    I want to be out there!

Ex. 2 to Supp. Decl. of Andrew Lucas.

## II

"The Fourth Amendment prohibits the use of unreasonable and therefore

excessive force by a police officer in the course of effecting an arrest." Tracy v.

Freshwater, 623 F.3d 90, 96 (2d Cir. 2010).  In deciding whether a particular use of

force was reasonable, we look to the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. 386, 396 (1989). Some of those factors might be helpful (or not) in a given case, but the ultimate question is always the same: "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." Id. at 397. In the end, "all that matters is whether [the officers'] actions were reasonable." Scott, 550 U.S. at 383.

"[W]e are careful to evaluate the record 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Tracy, 623 F.3d at 96 (quoting Graham, 490 U.S. at 396). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." Graham, 490 U.S. at 396 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973) (Friendly, J.)).

# III

Brown actively resisted throughout the process of her arrest.[2] For that reason--even that reason standing alone--the officers were permitted to use force to subdue her, as a matter of law: "[t]he fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer *no doubt* justifies the officer's use of *some* degree of force." Sullivan v. Gagnier, 225 F.3d 161, 165-66 (2d Cir. 2000) (first emphasis added); see also Tracy, 623 F.3d at 97 ("Tracy appeared to fail to comply with a direct order and to instead actively resist arrest, thus necessitating a forceful response.").

At the same time, resistance to arrest "does not give the officer license to use force without limit." Sullivan, 225 F.3d at 166. When a suspect resists arrest, "[t]he force used by the officer must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer." Id.

---

[2] In an online chat, Brown admitted: "I resisted arrest." Ex. 1 to Supp. Decl. of Andrew Lucas. The majority, however, hedges on that point, resorting to scare quotes. See Maj. Op. at 19-20 ("At most, her 'resistance' was a refusal to permit the easy application of handcuffs by placing her hands behind her back."). Scare quotes or none, any denial that Brown was resisting arrest "is so utterly discredited by the record that no reasonable jury could . . . believe [it]." Scott, 550 U.S. at 380.

11

No reasonable jury could find an abuse in this case--let alone misconduct so unreasonable as to justify "personal liability" against Officer Justin Naimoli and Officer Theodore Plevritis, which, as this Court has said, is payable from the officers' "savings, home equity, and [their children's] college funds." Gonzalez v. City of Schenectady, 728 F.3d 149, 162 (2d Cir. 2013). The majority relies on what it calls "likely speculation" that "a payment, if any, will be made by the City after a settlement." Maj. Op. at 23-24 n.15. Of course, we typically and appropriately adopt an attitude of complete indifference to the questions of (1) whether a case is likely to settle, and (2) what private arrangements, if any, defendants may have entered into to spread the (potentially ruinous) financial risk of an adverse civil judgment. The majority's expectation that the City will both settle this case and then indemnify the officers may alleviate somewhat the danger of inflicting personal liability on the police officers; but it warps application of the legal standard, which ceases to be *individual* liability under section 1983. See, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 676 ("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

12

## IV

The use of pepper spray was the climax of Brown's encounter with the police, and ultimately ended her resistance. "Unquestionably, infliction of pepper spray on an arrestee has a variety of incapacitating and painful effects." Tracy, 623 F.3d at 98. That is of course its utility. "[A]s such, its use constitutes a significant degree of force." Id. So "it should not be used lightly or gratuitously against an arrestee who is complying with police commands or otherwise poses no immediate threat to the arresting officer." Id.

But Brown was *not* complying with the officers' (lawful) commands--she was energetically resisting arrest. That fact, standing alone, will typically justify the use of significant force, including pepper spray. But here, the bursts of pepper spray were preceded by several minutes of physical resistance, repeated orders to "Stop resisting!", and then *specific* warnings about pepper spray--"GIVE US YOUR HANDS, OR YOU'RE GONNA GET PEPPER SPRAYED RIGHT NOW! GIVE US YOUR HANDS!"--all of which failed to subdue Brown. And as Brown admitted at deposition, she understood the officers' warning that she would be pepper sprayed a second time if she did not offer her hands. See Dep. of Imani Brown 54:21-24 ("Q: The second time you were pepper sprayed, did the

13

officers warn you that if you did not give them your hands you would be pepper sprayed? A: Yes."). The second burst of pepper spray was apparently the measure that worked: she finally offered her arms, at least in part, because she "was in physical pain" and she "didn't want to be pepper sprayed again." Dep. of Imani Brown, 56:11-15. Thereafter, the officers applied only minimal physical force.

The police can, in their discretion, resort to non-lethal, but serious, threats of force, in order to stop (or better yet, prevent) a suspect from resisting arrest. But such a threat will only be effective if officers are permitted to actually use the threatened force. We should not constitutionally require police to back off just because a lawful arrest encounters stubborn physical resistance. Cf. Scott, 550 U.S. at 385-86 ("[W]e are loath to lay down a rule requiring the police to allow fleeing suspects to get away whenever they drive so recklessly that they put other people's lives in danger. . . . The Constitution assuredly does not impose this invitation to impunity-earned-by-recklessness.") (emphasis omitted). It is eminently reasonable for an officer to (1) warn a resisting suspect that the level of force is about to be marginally escalated, then (2) actually use the force threatened when resistance continues. Reasonableness is all that the Fourth

Amendment requires; and reasonableness is a test that, at the safe end, is a matter of law. See, e.g, Tracy, 623 F.3d at 97.

In Tracy v. Freshwater, an arrestee named Tracy got into a struggle with a policeman named Freshwater. Id. at 97-98. The issue critical to the excessive force claim was whether Tracy was already handcuffed when Freshwater pepper-sprayed his face. See id. at 98. We remanded for a trial because "a reasonable juror could [have found] that the use of pepper spray deployed mere inches away from the face of a defendant *already in handcuffs* and *offering no further active resistance* constituted an unreasonable use of force." Id. (emphasis added). This case is the mirror image of Tracy. We know from the video that Brown was *not* "already in handcuffs." Id. And, as she admitted--and is obvious from the video--she *was* "offering . . . further active resistance," id., when the officers (1) threatened to use pepper spray, and then (2) made good on that threat.

No material fact is genuinely disputed. No trial is necessary.

15

## V

As the majority ultimately concedes, there is no "least restrictive alternative" requirement when making an arrest: "Police officers must be entitled to make a reasonable selection among alternative techniques for making an arrest." Maj. Op. at 21. Certainly, the police are not restricted to the measures and techniques suggested to us in "the peace of a judge's chambers," Graham, 490 U.S. at 396 (internal quotation marks omitted)--pace the majority's preference for other measures, see Maj. Op. at 9, 10 n.6, 21.

The majority opinion relies on its weighing of the three Graham factors--a determination that is, as the majority observes, "easier to describe than to make." Maj. Op. at 19. However, Graham itself confirms that these factors are intended to be a rough guide, and nothing more. They need not all be examined closely in every case; other unlisted factors might be relevant; and the relative importance of any one factor will vary. 490 U.S. at 396 ("the test of reasonableness . . . requires careful attention to the facts and circumstances of each particular case, *including*" the three factors) (emphasis added); see also Tracy, 623 F.3d at 96 (in evaluating reasonableness, "we are *guided* by consideration of *at least* three factors") (emphases added). That is because, ultimately, "all that matters is

16

whether [the officer's] actions were reasonable." Scott, 550 U.S. at 383. We consider the Graham factors only to the extent they shed light on whether a particular use of force was reasonable.

The majority emphasizes "the severity of the crime at issue," Graham, 490 U.S. at 396, and observes that Brown's "disorderly conduct offense is subject to a maximum penalty of fifteen days in jail." Maj. Op. at 19. But unless the Constitution requires the police to free suspects resisting arrest for minor offenses, this factor is of no weight in this case, in which the police began by seeking pedigree information for a summons, and overcame physical resistance by calibrated steps, preceded by warnings, without gratuitous violence.

The one Graham factor that obviously and directly applies here is whether the suspect "is actively resisting arrest." Graham, 490 U.S. at 396. That factor is essentially ignored by the majority, which observes dismissively that "Brown was not fleeing, nor physically attacking an officer, nor even making a move that an officer could reasonably interpret as threatening an attack." Maj. Op. at 19 (internal citations omitted). So? She was also not brushing her teeth. What she *was* doing, however, was "actively resisting arrest"; and she did that by physical struggle for as long as she possibly could. Even though this factor is not

17

dispositive (none of the Graham factors is), it strongly supports the use of force here.

The majority also believes that we need a jury to decide whether it was excessive force to wrestle Brown to the ground and then "struggle[] with her" in order to apply handcuffs. See Maj. Op. at 22 ("[A] jury will have to decide whether Fourth Amendment reasonableness was exceeded when Brown was taken to the ground after refusing to put her hands behind her back and when officers struggled with her on the ground and used pepper spray to accomplish handcuffing."). But the fact that a suspect "actively resist[s] arrest," by itself, "necessitat[es] a forceful response." Tracy, 623 F.3d at 97. That includes forcefully bringing her to the sidewalk, the ensuing struggle, and more--as necessary to effect the arrest.

According to the majority, "[n]o reason appears why, with Brown standing, each officer could not have simply held one of her arms, brought it behind her, and put handcuffs on her wrists." Maj. Op. at 21. But the video shows why the police took her to the ground: Brown refused to give up her hands, and instead grabbed hold of the metal structure of a scaffolding. In her own words: "I was standing there and not offering them my arms." Dep. of

18

Imani Brown, 50:13-14.  The majority has no fair ground for offering technical advice on whether it would have been better and safer if the police had pried back Brown's fingers one-by-one off the metal bar, or used any other forceful method that might have exposed Brown (or the officers) to different risks.  In any event, the relevant question is whether the use of force was objectively reasonable--not whether judges can identify alternative methods.  The Constitution does not enforce a preference among techniques short of excessive force.

* * *

The only excessive features of this case are the elaborate constitutionalization of the routine arrest of a disorderly individual, the unfair attack on the professional reputation of two NYPD officers, the absurd waste of judicial time that has ensued and will follow on remand, and the imposition on the valuable time of jurors.

**APPENDIX**

The video begins in the middle of the encounter.  Just after 5 a.m., at the intersection of Barclay and Broadway in lower Manhattan, Brown is standing on

19

a sidewalk.  She is facing away from a Starbucks coffee shop, leaning against metal scaffolding.  Two NYPD officers, Officer Justin Naimoli and Officer Theodore Plevritis, stand behind her, working to restrain her arms.

Officer Plevritis shouts to a bystander: "No!  She's under arrest!"  Brown is holding a cell phone and a purse in her right hand.  She pulls her right arm in toward her body, but Officer Naimoli is able to close metal handcuffs around her right wrist.  Turning her body 90 degrees to the left, now facing Officer Plevritis, Brown yells: "I just need to use the fucking bathroom!"  She slowly unwinds her body, turning back the right, and pulls her left arm free momentarily.  Officer Plevritis reaches to pull Brown's free arm back within reach, telling her, in a measured tone: "Stop moving your arms.  Stop resisting, miss.  Stop resisting.  Miss, stop resisting."

Brown does not stop resisting.  She grabs the metal scaffolding with her free hand.  Officer Plevritis reaches down, presumably to pry her grip loose from the scaffold, when she twirls once more, 180 degrees to the right, and steps back toward the Starbucks.  Officer Plevritis tells her: "Alright, you are going to the ground now."

Officer Naimoli starts to apply pressure to the front of her legs, while both officers, standing behind her, push her shoulders forward, well above her center of gravity. Officer Naimoli appears unable to take her to the ground, so Officer Plevritis winds up, and swings his leg forcefully into Brown's shins. The laws of physics do their work: Brown's body rotates forward, her waist the approximate pivot point. For an instant, she is parallel to the sidewalk, a few feet off the ground. Then she falls. See Video at 0:20.

The struggle continues. After rolling on the ground a bit, Brown coils into a crouch, knees on the ground, leaning forward. Both officers hover over her back. Officer Plevritis appears to have a solid grasp of Brown's left arm, and he pulls it up behind her, bent sharply at the elbow. Brown then springs half-way up out of her crouched position, and waddles forward, with both officers holding on to her back and arms. Brown is quiet at this point, but a crowd is gathering, and someone shouts, off-camera: "Officers, can you please let her go? Can you please let her go?" Both officers, sometimes in unison, repeatedly order Brown to give up her hands, and to stop resisting: "Put your han . . . Stop it. Stop resisting, Miss. Stop resisting. Stop resisting. Stop resisting. Stop it ma'am. Stop resisting. Stop resisting."

21

A voice crackles over the radio, and Officer Plevritis lets go of Brown's left arm--which remains free of handcuffs--to reach back for the radio on his hip. The crowd growing larger, he calls for assistance: "Can I have another unit over here to this location?" Officer Plevritis tries to regain his grip over Brown's left arm, but she wriggles free again, and rolls over back to the ground. For a brief moment, Brown tucks her free arm back underneath her body. "Miss, stop resisting." Brown asks: "What am I doing to you?"

The officers escalate their use of force: Officer Plevritis yells, "Stop it!", as he strikes Brown in the lower back with his knee. "Don't kick me," she says. Officer Naimoli then makes two sweeping movements with his left arm, seemingly trying to dislodge Brown's grip from her purse, or her cell phone. The phone ends up on the sidewalk, a few feet away. The officers continue to plead with Brown to comply, now employing a louder, more aggressive tone: "Stop resisting! Stop it! Stop resisting!"[3]

---

[3] At some point, the camera briefly turns away from the struggle to a friend of Brown's, who describes what happened in the moments preceding the arrest. His commentary is largely irrelevant to the excessive force claim, but it does go a long way to confirming that Brown was one of the individuals banging on the glass--rather than some unfortunate victim of mistaken identity:

> She wanted to use the bathroom at Starbucks. She was banging on

22

Brown continues to struggle with the officers from the ground. The officers are trying to pull her hands together behind her back, so the handcuffs, currently hanging around her right wrist, can be secured to her left. Officer Naimoli says, "Don't try to bite me!" It is not clear from the video whether, in fact, Brown was trying to bite anyone, but she responds, exasperated: "I'm not trying to bite you!" For a moment, Officer Plevritis holds her head against the sidewalk.

Members of the (still growing) crowd chime in from time to time: "What's the point of doing this?" Then, sarcastically mocking the NYPD's motto: "Courtesy, Professionalism, Respect!" Officer Naimoli responds in kind: "Yep, she's giving us her respect."

The struggle continues, and Brown says something like "I'm just trying . . . to pull my . . ."--then she tries to rise to a kneeling position. The officers wrestle her back to the ground, and Brown lets out a brief whimper. Officer Plevritis is trying to pull her left arm behind her back, but Brown has it planted securely

---

the door, asking them to use their discretion and let her go to the bathroom, and they called the police on her. . . .

23

underneath her body.  The officers raise the intensity and the volume of their voices once more: "STOP RESISTING!"

Brown does not stop resisting.  She continues to struggle.  The officers then threaten to escalate the level of force again, now shouting loudly: "GIVE US YOUR HANDS, OR YOU'RE GONNA GET PEPPER SPRAYED RIGHT NOW! GIVE US YOUR HANDS!"  See Video at 1:36.

Brown does not give up her hands.  She continues to struggle for the next 8 or 9 seconds--the time it takes Officer Plevritis to reach back and unholster his pepper spray.  He sprays Brown in the face, from about a foot away, for about one second.  See Video at 1:48.

For a moment, Brown appears to be going back to the ground.  Her skirt is off-kilter; her bare buttocks briefly exposed to the gathering crowd.  Someone off-camera asks an (inaudible) question, to which Officer Plevritis responds, loud and frustrated: "How about putting her hands behind her back?!"  Brown then starts rocking back and forth from her knees, as the crowd pulls in tighter around the struggling trio. Officer Plevritis reacts by letting Brown go, springing to his feet, and yelling at the crowd: "Get away from here!  Back up!  Back up!  Back up!

24

Everyone back up!"  Officer Naimoli is now alone in his attempted restraint of the (still-struggling) Brown.

From her knees, Brown continues the rocking motion.  Her hands remain in front of her, only her right wrist in cuffs.  Officer Plevritis shouts again: "Stop it!  Get on the ground!"  Brown does not comply.  Officer Plevritis, now standing in front of Brown, warns her: "You are gonna get it again."  But Brown's behavior does not change, and Officer Plevritis sprays her with pepper spray a second time, again in the face, for less than a second, from a distance that is difficult to discern from the video (no more than one foot).  <u>See</u> Video at 2:12.  The officers continue to shout: "Put your hands behind your back!  STOP RESISTING!  Put your hands behind your back!"

Finally, Brown appears to relent.  Someone shouts, off-camera: "You guys are fucking cowards!"  At last, the officers secure the handcuffs on Brown's left wrist.

Two new officers appear on camera, apparently having just arrived on the scene.  One shouts loudly and repeatedly at the bystanders (including the camera operator) to move back.  Brown is doubled over on her knees. She shouts, presumably to the officers: "Can you please pull my skirt down so I'm not

25

flashing the fucking street please?"  One of the officers tells Brown that she "should have thought of that," and orders her to "stand up."  Brown refuses to cooperate: "No!", she shouts from the ground.  Officers Naimoli and Plevritis forcibly pull her to a standing position, and walk her, now securely handcuffed, to a nearby police cruiser.  Another officer is still shouting at the nearby onlookers: "Get back!  Move back!"  Officer Plevritis orders Brown to "get in the car" and to "sit down in the car," as she appears to lean her upper body out of the door.  Officer Plevritis forces her back into the seat, and secures the door.

The footage skips ahead a moment, and Brown is lead out of the car by Officers Plevritis and Naimoli, while at least three other officers look on (still at the same intersection).  For reasons that are not clear, the handcuffs remain attached to Brown's right wrist, but now they dangle alone--her left hand is free again.  Officer Plevritis asks her to "step out and turn around."  Officer Naimoli tells her to "step out of the car and put your hands behind her back."  This time, Brown turns around without objection, and offers her hands to be re-handcuffed.  Officer Plevritis explains: "Now if you would have done this, you wouldn't have gotten sprayed."  The officers secure the handcuffs, again, and Brown is returned, quietly, to the back seat of the police car.